391 So.2d 885 (1980)
TALLULAH PRODUCTION CREDIT ASSOCIATION, Appellant,
v.
J. C. TURNER, Appellee.
Ruth P. TURNER, Appellee,
v.
Jimmie C. TURNER et ux., Appellee.
Nos. 14294, 14295.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1980.
Writ Refused January 26, 1981.
*886 Voelker, Ragland, Brackin & Crigler by William B. Ragland, Jr., Lake Providence, for plaintiff-appellant, Tallulah Production Credit Association.
Hamilton, Carroll & Miller by Orlando N. Hamilton, Jr., Oak Grove, for Ruth P. Turner.
Jimmie C. Turner, in pro. per.
Before PRICE, HALL, MARVIN, JASPER E. JONES and FRED W. JONES, Jr., JJ.
MARVIN, Judge.
The dispute in these consolidated cases is between the pledgee of a collateral mortgage note and a subordinated secured creditor of a common debtor as to who outranks whom as to the proceeds from the sale of the property securing both creditors.
The trial court held that the pledgee does not outrank the subordinated creditor as to loans made to the pledgor after the pledge and subordination where the circumstances indicate that the subordinated creditor was not aware that she was subordinating other than to one specific indebtedness and where promissory notes evidencing these later loans were not "clearly identified" with the pledge. The pledgee appeals. We reverse.
Resolution of the issues requires our consideration of the collateral mortgage, the subordination, the pledge agreement, and CC Art. 3158, in the light of the particular circumstances of this case.
The subordinated secured creditor (Mrs. Turner) is the mother of the common debtor (Jimmie C. Turner). She sold the property in question to her son on credit in 1973. About one month later Jimmie sought to borrow money from Tallulah Production Credit Association (PCA). On November 13, 1973, Jimmie executed the collateral mortgage and the separate pledge agreement and his mother executed the act of subordination.
The collateral mortgage is titled in large bold-face print "Collateral Mortgage", and its pertinent provisions read that the property shall remain mortgaged "... until the full payment of any debt or obligation for which the note may be pledged as collateral security."
The pertinent provisions of the pledge agreement read:
"The consideration for the pledge is the particular loan ... currently made to... Pledgor ... and any further advances... and any further or other debts ... of Pledgor to Pledgee until the pledge is cancelled as hereafter provided.
"The pledge shall ... secure the payment of:
"(1) The particular loan ... $12,000 ...
*887 "(2) Any and all further or other loans or advances to or further or other debts, obligations, or liabilities of Pledgor to Pledgee, now existing or hereafter arising, up to a total of, excluding and not including the particular loan to or debt of Pledgor herein described, $12,000.
"* * * It is the purpose of this pledge to fully secure Pledgee in every way and in particular with all the rights ... and benefits provided and authorized by Article 3158 ...
"This pledge shall remain in ... effect until ... the pledged instrument ... shall have been legally and physically returned to the Pledgor. * * *
"This pledge shall in no way affect and shall in no way be affected by any other security for the payment of any amounts here secured."
The "Act of Subordination" in conventional typewritten form, reads to the effect that Mrs. Turner subordinates her "mortgage" to the "Mortgage of Tallulah Production Credit Association" and that it is her intent that "the said mortgage in favor of Tallulah Production Credit Association shall be a first mortgage ... and that [her] mortgage ... shall be ... a second mortgage... and [that] in the event of a sale of the said mortgaged property, by foreclosure... the said note [of PCA] shall be paid by preference and priority ... of the notes held by [Mrs. Turner] ..."
About six months after these instruments were executed and recorded, Jimmie Turner paid the particular loan of $12,000. PCA retained the collateral mortgage note. In 1975 Jimmie Turner executed two notes to PCA for money loaned him at that time. Each of these notes were noted as being secured by a crop pledge and a chattel mortgage. No mention was made on these notes of the 1973 collateral pledge agreement or of the 1973 collateral mortgage note.
In 1979 PCA sued to foreclose on its $12,000 collateral mortgage note and asserted that the indebtednesses which arose in 1975 were secured by the collateral mortgage note as well as by the 1975 crop pledge and chattel mortgage. Mrs. Turner then sued for foreclosure by executory process for the balance due on her vendor's lien. PCA intervened in her action. Eventually the property was sold by the Sheriff and the distribution of the balance of the proceeds ($26,335) awaits final disposition of the competing claims of Mrs. Turner and PCA.

THE ACT OF SUBORDINATION
Mrs. Turner effectively subordinated her security rights (vendor's lien, mortgage) to the mortgage of PCA. She declared in the subordination that her note arising out of the "Act of Credit Sale" to her son would be subordinate to, and would be a "second mortgage" to PCA's "first mortgage", and that in the event of a foreclosure, PCA's mortgage note would be preferred and paid before her mortgage note. Terms used in an alleged waiver of legal rights must be construed in the light of the legal significance intended by the parties. See Sliman v. McBee, 311 So.2d 248, 253 (La.1975). For us to hold that Mrs. Turner waived only her "mortgage" and not her vendor's lien, as she contends, would abort the stated intent of the act of subordination.
The act of subordination relates only to the ranking of the security rights held by Mrs. Turner and by PCA and does not otherwise purport to define or limit, or limit the effect of the security. The effect of the security instrument must be determined by the instrument itself and Mrs. Turner cannot complain that she was not aware that she was subordinating to a collateral mortgage. PCA made no representations to Mrs. Turner.

THE COLLATERAL MORTGAGE
Mortgage is a generic term which encompasses several species. We have conventional, legal, and judicial mortgages. Three types of conventional mortgages are recognized in Louisiana: the ordinary mortgage, the mortgage to secure future advances, and the collateral mortgage. The collateral mortgage is the product of judicial recognition that one can pledge a note secured by a *888 mortgage and use this pledge to secure yet another debt. First Guaranty Bank v. Alford, 366 So.2d 1299, 1303 (La.1978). There, the Supreme Court further explained:
"A collateral mortgage note may be pledged to secure future obligations. In that event full payment of a given obligation [particular obligation] will not extinguish the collateral mortgage note and accompanying mortgage. (And in such cases the collateral mortgage will have a ranking from the initial pledge. La.Civil Code, Art. 3158.)"
Bracketed material and emphasis supplied.
This collateral mortgage expressly provides that the mortgage note may be pledged to secure other debts and obligations and that the property shall remain mortgaged until the other debts secured by the pledged note have been fully paid.

THE COLLATERAL PLEDGE AGREEMENT
This instrument pledges the collateral mortgage note as security for the particular loan ($12,000) and any further or other debts of pledgor to pledgee until the pledge is cancelled as the instrument provides. Cancellation of the pledge occurs only when the pledged note is legally and physically returned to the pledgor. As between Jimmie Turner and PCA, Jimmie Turner could not contend that the pledged note did not secure his indebtedness to PCA which arose in 1975. See First Guaranty Bank, supra, and CC Art. 3158, as discussed therein.
We find no requirement of a written connection between the subsequent loan and a pledged collateral mortgage note. The trial court correctly observed that the required connexity between the subsequent loan and the pledged collateral mortgage note may be satisfied by the pledge agreement. See First Guaranty Bank, supra. The pledge agreement, which expresses the contractual intent of the pledgor and pledgee, determines whether subsequent or further loans are secured by the pledged note. This pledge agreement is sufficiently broad and express to cover all loans made by PCA to Jimmie Turner while PCA retained the pledged note.
The fact that the 1975 loans were noted as being secured by a crop pledge and a chattel mortgage does not negate the security of the collateral mortgage note because the pledge agreement states that the pledge shall in no way be affected by any other security for payment of any amounts secured by the pledge. It is axiomatic and in keeping with the function of the collateral mortgage that this collateral mortgage and pledge agreement, by their express terms, secured "any and all further or other loans... or further or other debts ... of pledgor to pledgee, [then] existing or [later] arising ..."
Paraphrased, CC Art. 3158[1] effectively provides that whenever a pledge of a mortgage *889 note is made to secure indebtednesses of the pledgor to the pledgee which arise after the pledge is made, and the pledged instrument remains in the hands of the pledgee, and without the necessity of any added notification or other formality, the indebtednesses of the pledgor to the pledgee which arise after the pledge shall be secured by the pledged instrument to the same extent as if the indebtednesses had come into existence when the pledge was made. If the pledge was made in good faith, the pledge shall be as valid against third persons as it is against the pledgor.
As in New Orleans Silversmiths, Inc. v. Toups, 261 So.2d 252 (La.App. 4th Cir. 1972), writ refused, the "obvious tenor of these documents [the collateral mortgage and the pledge agreement] is to fully utilize the retrospective privilege afforded by LSA-C.C. art. 3158." It is true that that case stated that retrospective effect would be given to subsequent loans only if four conditions were met. That court apparently attempted to determine and derive from the article the conditions under which the article would be applied. These conditions were:
The initial pledge was properly confected,
Each succeeding loan was specifically secured by a pledge of the instrument.
The parties to the pledge agreed that the pledge would secure any obligations of the pledgor arising after the pledge, and
The pledged instrument remained in the hands of the pledgee and the parties acted in good faith at all times.
Even if we agree that the second condition is derived from CC Art. 3158, as the other three conditions obviously are, we find that this second condition was fulfilled by the terms of the pledge agreement. That agreement expressed that the pledge of the collateral mortgage note "shall ... secure the payment of: (1) the particular debt [and] (2) any and all further or other debts ... of Pledgor to Pledgee, ... hereafter arising, up to a total of ... $12,000."
We find that Art. 3158 permits a collateral mortgage note to be pledged in 1973 to secure any further debts of pledgor to pledgee which may arise afterward and that a debt created in 1975 by pledgor to pledgee will be secured by the pledged collateral mortgage note though the 1975 debt does not itself contain the notation that it is secured by the pledge. The obligations which are secured by the pledge are determined from the pledge agreement even though the evidence of the obligation does not mention that it is so secured. Retrospective effect of the pledgor's privilege is afforded by the statute and not by the pledge agreement.
The judgment appealed is reversed and these cases are remanded to lawfully authorize the proceeds of the sale of the common debtor's property to be paid pro tanto by preference and priority to PCA to the extent of its collateral mortgage note over the security held by Mrs. Turner. See Central Bank v. Bishop, 375 So.2d 149 (La.App. 2d Cir. 1979), writ refused.
*890 All costs, here and below, are assessed against the appellee. REVERSED and REMANDED.
FRED W. JONES, Jr., J., dissents with written reasons.
FRED W. JONES, Jr., Judge, dissenting.
These consolidated suits involve competing claims by rival creditors to the proceeds of a sheriff's sale of mortgaged property.
By credit deed dated October 11, 1973, Ruth P. Turner conveyed to her son, Jimmie C. Turner, husband of Willie Rustin Turner, certain immovable property located in West Carroll Parish. The vendee executed a promissory note in the sum of $27,200 representing the consideration for this sale, which note was secured by a vendor's lien and special mortgage stipulated in the deed which was duly recorded on November 12, 1973.
On November 13, 1973 Jimmie C. Turner borrowed from Tallulah Production Credit Association (TPCA) $12,000 and executed a hand note in favor of the creditor to evidence that indebtedness. In connection with that transaction, on the same date Turner and his wife executed a collateral mortgage note in the principal amount of $12,000, payable to the order of "Myself" at the office of TPCA, which note was due on demand after December 1, 1974. This note was paraphed for identification with an Act of Collateral Mortgage, recorded on November 19, 1973, covering and affecting the immovable property conveyed to Turner by his mother. Also as part of this transaction Turner and his wife, on November 13, 1973, executed a Collateral Pledge Agreement under which the described collateral mortgage note was pledged to TPCA to secure payment of the $12,000 hand note. In addition, the pledge agreement provided that it was to secure:
"Any and all future or other loans or advances to or further or other debts, obligations, or liabilities of pledgor to pledgee, now existing or hereafter arising, up to a total of, excluding and not including the particular loan to or debt of pledgor described, TWELVE THOUSAND AND NO/100 ($12,000.00) DOLLARS.... This pledge shall remain in full force and effect until all indebtedness, obligations, and liabilities secured hereby shall have been paid in full and the pledge instruments or items shall have been legally and physically returned to the pledgor."
The collateral mortgage note was delivered to TPCA on November 13, 1973 and has remained in its possession.
On November 13, 1973, Ruth P. Turner executed an Act of Subordination which provided that she subordinated her mortgage securing the $27,200 promissory note to and in favor of the "mortgage to Tallulah Production Credit Association" for $12,000, specifically stipulating that it was her intention that her mortgage "in all respects and for all purposes be subordinate and inferior to the aforesaid mortgage granted by Jimmie C. Turner in favor of Tallulah Production Credit Association." The Act of Subordination was recorded on November 19, 1973.
Jimmie C. Turner paid the initial $12,000 loan from TPCA in full on May 30, 1974. On September 10, 1975, he executed a promissory note in favor of TPCA for $28,000, which note was paraphed for identification with and secured by a crop pledge and chattel mortgage. On November 18, 1975 Turner executed another promissory note in favor of TPCA, for $3,000, which note stipulated that its payment was also secured by the crop pledge and chattel mortgage identified with the September 10 note. Neither of these notes made any reference to the pledge of the $12,000 collateral mortgage note nor to the collateral mortgage.
TPCA filed suit on January 25, 1979 to foreclose on the $12,000 collateral mortgage executed by Turner and his wife on November 13, 1973, asserting that Turner had defaulted in his payment of the last two described notes which plaintiff alleged were secured by the pledge of the $12,000 collateral mortgage note in addition to the crop pledge and chattel mortgage.
*891 Ruth P. Turner filed a petition for executory process on March 28, 1979, seeking to have the immovable property covered by her vendor's lien and mortgage sold at public sale to satisfy the unpaid balance due on her $27,200 promissory note. TPCA intervened in this action, claiming that the $12,000 collateral mortgage which secured its indebtedness outranked plaintiff's lien because of the Act of Subordination executed by her.
These suits were consolidated for trial purposes.
The immovable property allegedly covered by the competing liens was sold at public sale and a balance of $26,335.60 was held by the Sheriff of West Carroll Parish for distribution in accordance with a court judgment.
Holding that TPCA had failed to prove "some circumstances or writing to show that the parties unequivocally intended to pledge the collateral note and mortgage to secure the indebtedness" [evidenced by promissory notes dated September 10 and November 18, 1975], the trial judge ruled that Ruth P. Turner's claim primed that of TPCA to the proceeds of the sheriff's sale and rendered judgment accordingly. The district judge also questioned, incidentally, whether the Act of Subordination was intended to subordinate the mortgage in favor of Ruth P. Turner to any obligation other than the initial loan of $12,000 by TPCA to Jimmie C. Turner since the instrument in question never referred to a collateral mortgage.
TPCA appealed from the lower court's judgment. Although numerous specifications of error were alleged, their thrust is that the trial judge erred in his finding that: (1) there was no "connection " between the two promissory notes sued upon and the Act of Pledge and (2) that the Act of Subordination should have in some way alerted Ruth P. Turner to the fact that she was subordinating to a collateral mortgage.
The unique nature of the collateral mortgage, a specie of conventional mortgage created by our jurisprudence, has been extensively analyzed in appellate court cases and scholarly law review articles.[1] There seems to be general agreement that the purpose of the collateral mortgage package is to confect a mortgage note that can be pledged as collateral security for either a pre-existing debt, for a debt created contemporaneously with the mortgage, for a future debt, or for a combination of these. Therefore, the package represents a blend of pledge and mortgage, drawing upon both for its efficacy but not fully on either. The collateral mortgage note or "ne varietur" note is not the evidence of the indebtedness, but is merely the security that will be pledged as collateral for the true debt. Therefore, the mortgagor must also become a pledgor of the collateral mortgage note itself to the creditor to secure a debt which is generally but not necessarily evidenced by a hand note.
It is now clear that, unlike other conventional mortgages which affect third persons upon filing in the office of the clerk of court, the collateral mortgage which has been filed obtains ranking against third parties only from the time that it is issued or pledged to secure a debt. When the secured debt is paid and the collateral mortgage note returned to the pledgor, the collateral mortgage is not extinguished. However, it does lose its original ranking. Subsequent pledges of the collateral mortgage note are called "reissuances" and the collateral mortgage obtains new rank at the date of reissuance. Because of confusion which arose over what constituted a "reissuance", La.Civil Code Article 3158 was amended in 1952 to provide that the date for the ranking of a collateral mortgage is the date of the pledge and not the date of the advance of funds.
The first appellate court case to interpret Article 3158 after the 1952 amendment was New Orleans Silversmiths, Inc. v. Toups, 261 So.2d 452 (La.App. 4th Cir. 1972), which *892 involved competing collateral mortgages. It held that the effect of the amendment was to impart a retrospective effect to all subsequent advances to the date of the initial loan, provided:
"(a) the initial pledge was properly confected
(b) each succeeding loan was specifically secured by a pledge of the instrument (emphasis added)
(c) the parties had mutually agreed at the time of the original pledge that it would also secure any obligations or liabilities of the pledgor then existing or thereafter arising to the limit of the pledge
(d) all of the aforegoing being subject to the pledge instrument continuously remaining in the hands of the pledgee and the parties acting in good faith at all times."
It was further held that the parties were authorized by the codal article to agree that its retroactive effect would apply not only to renewal of the primary loan but to new loans even though the initial loan had been liquidated. The legal result would be the securing of the subsequent obligations by the original collateral pledged to the same extent as if the debt was incurred at the time the pledge was confected.
The claim that a collateral mortgage did not secure loans made subsequent to an initial loan was considered by the Louisiana Supreme Court in First Guaranty Bank v. Alford, 366 So.2d 1299 (La.1979). There a husband had executed a $155,000 promissory note evidencing money borrowed from a bank. His wife executed a collateral mortgage note and collateral mortgage covering her separate property, followed by her execution of a written act of pledge specifying that the collateral mortgage note was pledged to secure payment of the $155,000 note. The husband paid off the $155,000 note by borrowing other funds from the bank, which retained possession of the wife's collateral mortgage note. When the bank attempted to recover the husband's outstanding indebtedness by foreclosing on the wife's collateral mortgage she resisted, claiming that the bank had no security interest in her property because the original obligation had been paid.
Sustaining the wife's position, the court explained that the pledge provisions of the Civil Code determine whether a creditor in these circumstances is secured and that, while a collateral mortgage note may be pledged to secure future obligations, it may also be pledged to secure only a specific obligation. Since the pledge agreement in question plainly stated that it was to secure only the original $155,000 debt, this represented the intent of the parties. Therefore, once that obligation was liquidated the pledge fell, leaving the bank without a security interest either in the collateral mortgage note or collateral mortgage.
Adverting to the requirements listed in the New Orleans Silversmiths case, supra, for determining whether future loans are secured by a collateral mortgage note, I conclude upon examining this record that (1) the initial pledge was properly confected; (2) the parties agreed in the Act of Pledge that it would secure the original $12,000 loan and debts thereafter arising to the limit of the pledge; (3) that the collateral mortgage note continuously remained in the hands of the pledgee, TPCA, and (4) the parties acted in good faith at all times.
The primary question posed by this litigation is: does Article 3158 require as held by Silversmiths, in addition to these listed conditions, that each succeeding loan be specifically secured by a pledge of the instrument evidencing that indebtedness?
Although the text of Article 3158 tends toward obfuscation, it does provide, when the act of pledge secures future debts and the pledged instrument remains in the hands of the pledgee, that:
"... the instrument or item may remain in pledge to the pledgee or, without withdrawal from the hands of the pledgee, be repledged to the pledgee to secure at any time any renewal or renewals of the original loan or any part thereof or any new or additional loans ..." (Emphasis added)
*893 The import of this particular language seems to support the conclusion that a creditor who desires to avail himself of the ranking privilege afforded by Article 3158 must prove, by a legally acceptable method, that at the time of any subsequent loan the parties intended that it be secured by the prior executed act of pledge which, in effect, constitutes a "repledging to the pledgee" of the original collateral with the advantage of retroactive ranking.[2]
The majority holds that, even if the second condition listed in Silversmiths can be derived from the language of Article 3158, that requirement was fulfilled by the terms of the pledge agreement which provided that it was intended to secure payment of future debts up to $12,000. This is, of course, the third condition set forth in Silversmiths. Therefore, the effect of the majority's reasoning is to eliminate the second condition.
The assertion that proof of the intent of the parties with reference to the security for each future loan is supplied by the language of the act of pledge relating to those loans is untenable. It is readily conceivable that changing circumstances could persuade the parties that either no security was necessary for a subsequent loan or that the furnishing of other security would be more advisable (as was apparently done here).
Of course, the evidence to prove the intent of the parties in connection with a particular subsequent loan does not have to be in writing. Although it may be customary to execute a hand note to represent the principal obligation which is secured by the collateral mortgage package, that is not necessary. Further, since under Article 3158 a negotiable instrument may be pledged simply by delivery, no written act of pledge is required for the efficacy of this security device. It follows, therefore, that there is no requirement for a written connection between the subsequent loan and the collateral mortgage note.
In the cases under consideration the record reveals no evidence, either written or oral, offered by TPCA to establish that the parties intended for the promissory notes dated September 10, 1975 and November 18, 1975 to be secured by the Act of Pledge dated November 13, 1973. On the contrary, identification on their faces of those notes with a crop pledge and chattel mortgage indicated that these instruments were the only security for those promissory notes. In fact, assuming for the sake of argument that the language in the Act of Pledge pertaining to future loans establishes presumptive evidence of the parties' intent at the time of each subsequent loan, that presumption would be rebutted here by the positive evidence of the furnishing of other collateral to secure these loans.
To summarize, I would hold that for a creditor to avail himself of the ranking privilege with reference to future loans provided for by Article 3158: (1) the initial pledge must be properly confected, with the parties mutually agreeing at the time that the pledge would secure obligations arising thereafter; (2) the collateral must continuously remain in the hands of the pledgee; (3) the pledgee must prove that at the time of the making of the subsequent loan or loans involved in the litigation it was the intent of the parties that the pledge of the original collateral secure that loan or loans; and (4) the parties acted in good faith at all times.
Since the appellant did not meet condition (3), I agree with the trial judge that Ruth P. Turner was entitled by preference and priority over TPCA to the funds held by the Sheriff of West Carroll Parish after the public sale of the immovable property covered by her vendor's lien and mortgage.
*894 For these reasons, I respectfully dissent from the majority opinion, and would affirm the judgment of the trial court.
NOTES
[1] We underline the provisions of this article which we think are pertinent:

"... [T]his privilege [of the pledgee] shall take place against third persons only in case the pledge is proved by some written instrument...
"When a debtor wishes to pledge promissory notes, bills of exchange, bills of lading, stocks, bonds, policies of life insurance, or written obligations of any kind, he shall deliver to the creditor the notes, bills of exchange, bills of lading, stocks, bonds, policies of life insurance, or other written obligations, so pledged, and such pledge so made, except as hereinafter provided with regard to life insurance policies, shall without further formalities be valid as well against third persons as against the pledger thereof, if made in good faith, provided that where the pledge of instruments not negotiable, the debtor must be notified thereof, it being understood that no notification is required in the case of the pledge of certificates of corporation stock. All pledges may be made by private writing of any kind if only the intention to pledge be shown in writing, but all pledges, except of a life insurance policy in favor of the insurer, must be accompanied by actual delivery. The pledge of a life insurance policy must also be evidenced by a written assignment thereof as security to the pledgee and by delivery of the pledge or assignment to the insurer and, unless the beneficiary thereof may be changed upon the sole request of the insured, or unless pledge or assignment without the consent of the beneficiary be specifically provided for in the policy, must be accompanied by the consent of any named beneficiary who is not the insured or his estate; it is further provided that whenever a pledge of any instrument or item of the kind listed in this article is made to secure a particular loan or debt, or to secure advances to be made up to a certain amount, and, if so desired or provided, to secure any other obligations or liabilities of the pledger to the pledgee, then existing or thereafter arising, up to the limit of the pledge, and the pledge instrument or item remains and has remained in the hands of the pledgee, the instrument or item may remain in pledge to the pledgee or, without withdrawal from the hands of the pledgee, be repledged to the pledgee to secure at any time any renewal or renewals of the original loan or any part thereof or any new or additional loans, even though the original loan has been reduced or paid, up to the total limit which it was agreed should be secured by the pledge, and, if so desired or provided, to secure any other obligations or liabilities of the pledger to the pledgee, then existing or thereafter arising, up to the limit of the pledge, without any added notification or other formality, and the pledge shall be valid as well against third persons as against the pledger thereof, if made in good faith: and such renewals, additional loans and advances or other obligations or liabilities shall be secured by the collateral to the same extent as if they came into existence when the instrument or item was originally pledged and the pledge was made to secure them; * * *"
[1] Nathan and Marshall, The Collateral Mortgage, 33 La.L.Rev. 497 (1973); Work of Appellate Courts-1977-1978, 39 L.Rev. 721, 722.
[2] Apparently this was the way that the authors in Nathan and Marshall, The Collateral Mortgage, 33 La.L.Rev. 457, at p. 523 construed the article. For example, they state:

"The major objection to the retrospective ranking afforded by article 3158 is the possibility of abuse and injury to innocent third parties ... the specific criticism ignores the fact that several bases must be touched before the retrospective protection afforded by article 3158 even comes into play: ... (2) each succeeding loan must be specifically secured by a pledge of the original collateral; ..."