420 So.2d 463 (1982)
Mary Elizabeth Rogers MINGLEDORFF a/k/a Mrs. Mary Elizabeth Weaks, Plaintiff-Appellant/Appellee,
v.
AMERICAN BANK AND TRUST COMPANY IN MONROE, Monroe Building and Loan Association and ISM, Inc. d/b/a O.K. Finance, and Ouachita National Bank in Monroe, et al., Defendants-Appellees/Appellants.
No. 14829.
Court of Appeal of Louisiana, Second Circuit.
April 5, 1982.
On Rehearing September 20, 1982.
Writ Denied December 10, 1982.
*464 Guerriero, Smith, Hingle & Anzalone by Joe D. Guerriero, Monroe, for plaintiff-appellant/appellee, Mary Elizabeth Rogers Mingledorff a/k/a Mrs. Mary Elizabeth Weaks.
Hudson, Potts & Bernstein by W. Craig Henry, Monroe, for defendant-appellee/appellant, Ouachita Nat. Bank.
Hudson, Potts & Bernstein by James A. Rountree, Monroe, for defendants-appellees/appellants, Monroe Building and Loan Ass'n and ISM, Inc. d/b/a O.K. Finance.
Boles & Mounger by Charles H. Ryan, Monroe, for defendant-appellee/appellant, American Bank and Trust Co.
Brown, Wicker & Lee by Joseph S. Cage, Jr., Monroe, for defendant-appellee/appellant, L. Edwin Greer.
Before PRICE, MARVIN and SEXTON, JJ.
SEXTON, Judge.
In this action for the ranking of mortgages and privileges against the property of J. C. Mingledorff, the creditors, American Bank and Trust Company in Monroe, Mary Elizabeth Rogers Mingledorff a/k/a Mary Elizabeth Weaks, Monroe Building and Loan Association, ISM, Inc. d/b/a O.K. Finance, and Ouachita National Bank in Monroe all appeal from a trial court judgment which ranked their mortgages as inferior.
The property encumbered by the various recorded mortgages and privileges consists of two separate funds, each of which has been deposited in the registry of the Fourth Judicial District Court. The first fund (Fund No. 1), is made up of the proceeds from the sale of Mr. Mingledorff's residence in Monroe, Louisiana. Fund No. 2 consists of Mr. Mingledorff's interest in the successions of his parents, who both died prior to 1979. The distinction between the funds is important since there exist different claims relating to the two separate funds. We affirm the trial court's ranking with respect to both funds.
FUND NO. 1
Those having claims against Fund No. 1 as ranked by the trial court are as follows:
1. L. Edwin Greer by virtue of his mortgage to "Future Holder" in the amount of $25,000 recorded January 5, 1979;
2. Monroe Building and Loan Association by virtue of a lien arising from attachment, recorded January 8, 1979, with a suit on a note which was eventually reduced to judgment on November 19, 1979;
3. ISM, Inc., by virtue of a lien arising from attachment, recorded January 8, 1979, with a suit on a note which was eventually reduced to judgment on November 19, 1979; and
4. Mary Elizabeth Rogers Mingledorff, by virtue of a judgment on rule dated January 11, 1979, reflecting an inscription by the Clerk of Court to the effect that it was filed and recorded on January 11, 1979.
The principal claimants to Fund No. 1 are L. Edwin Greer, Monroe Building and Loan Association, and ISM, Inc. d/b/a O.K. Finance. The claims of these three creditors *465 apparently well exceed the balance held in Fund No. 1, though the amount thereof is unclear to us from the record.
The only issue on appeal, with regard to Fund No. 1, is whether the instrument filed in the mortgage records on January 5, 1979, at the request of L. Edwin Greer, was in fact a valid mortgage. The facts relating to the document are not disputed.
Mr. Greer had acted as legal counsel for Mr. Mingledorff and had been promised a fee of $25,000 for his services. Mr. Mingledorff paid $7,600 of that amount. In December of 1978 Mr. Greer requested security for his fees and legal expenses then outstanding, and for anticipated expenses. Mr. Greer drew up a promissory note for $25,000 secured by a mortgage on Mr. Mingledorff's residence in Monroe. The amount actually owed Mr. Greer on the note at the time of trial was $15,624 (plus legal interest and attorney fees as per the note). These instruments were then sent to Mr. Mingledorff in California where he was temporarily located. Mr. Mingledorff signed the mortgage in the presence of a notary and two witnesses as is required for an authentic act. Mr. Mingledorff then sent the mortgage to Mr. Greer. Since the note was payable to any future holder and therefore negotiable, Mr. Greer instructed Mr. Mingledorff to mail only the mortgage and to hand deliver the note to Mr. Greer or to a mutual friend in Monroe when Mr. Mingledorff returned to the state. Mr. Greer had the mortgage recorded in Ouachita Parish on January 5, 1979. At that point in time Mr. Mingledorff still held the note as instructed by Mr. Greer. The note was later delivered to the mutual friend, who then delivered the note to Mr. Greer.
Monroe Building and Loan Association and O.K. Finance argue that, since the note was still in the hands of the maker and not yet delivered to Mr. Greer when the mortgage was recorded, the mortgage is invalid. They also contend the instrument here is a collateral mortgage and that such a mortgage is ineffectual until the note and mortgage are pledged. Also they allege that there was a lack of acceptance of the mortgage and note by Mr. Greer and without an acceptance there can be no valid mortgage. If any of these assertions are correct, the mortgages recorded by Monroe Building and Loan Association and O.K. Finance on January 8, 1979, outrank Mr. Greer's mortgage. Monroe Building and Loan Association and then O.K. Finance as prime secured creditors would be entitled to the assets in Fund No. 1.
The trial court found no merit in the arguments of Monroe Building and Loan Association and O.K. Finance. First addressing the issue of whether the mortgage and note constituted a collateral mortgage, the trial court found that the jurisprudence clearly establishes that three instruments are required for a collateral mortgage to exist: a mortgage, a note, and a hand note. Greer's mortgage cannot be classified as a collateral mortgage because the third instrument, the hand note, was not executed nor was there any intent to issue such a note. The trial court in written reasons for judgment stated:
"In the instant case, there is no evidence that the `ne varietur' note and mortgage were pledged to secure a debt widened by another note on [sic] instrument. There is no merit to the argument that the `ne varietur' note, rather than the hand note, is evidence of indebtedness. True, the `ne varietur' note is evidence of the obligation secured by the mortgage but it is the third instrument (the hand note) in the collateral mortgage which is evidence of the indebtedness. Cameron Brown South, Inc. v. East Glen Oaks, Inc., 341 So.2d 450."
We agree with the trial court that the instruments under consideration here do not constitute a collateral mortgage. A collateral mortgage is a mortgage designed and intended to secure a mortgage note pledged as collateral security for a debt or a succession of debts. A collateral mortgage is not designed to directly secure an existing debt, LSA-C.C. Arts. 3292 and 3293; Thrift Funds Canal, Inc. v. Foy, 261 La. 573, 260 So.2d 628 (1972), rehearing denied; First Guaranty Bank v. Alford, 366 So.2d *466 1299 (La.1978), rehearing denied. Instead, the collateral mortgage note and the mortgage which secures it are pledged to secure a debt. First Guaranty Bank, supra.
Clearly, the mortgage at issue in this matter is not a collateral mortgage. Even though the note was made payable to any future holder, the evidence establishes that the mortgage here directly secures an existing debt, and does not involve a pledge of a note and mortgage to secure a debt. See Thrift Funds, supra. We conclude that the present mortgage is one for a specific debt.
The issue remaining, with regard to Mr. Greer's mortgage, is whether Mr. Mingledorff's continued possession of the note at the time the mortgage was recorded rendered the mortgage invalid.
Mr. Greer cites both Scott v. Corkern, 231 La. 368, 91 So.2d 569 (La. 1956) and Central Bank v. Bishop, 353 So.2d 1109 (La.App. 2d Cir. 1977), for the proposition that the jurisprudence permits a debtor to hold an instrument, negotiable or not, as agent for the creditor. We note that in both cases, the instruments were pledged and also that the pledged instruments (a note in Central Bank and an insurance policy in Scott) were first delivered to the pledgee before winding up in the pledgor's possession. In the instant case we are dealing with a note, not a pledge of that note. LSA-C.C. Art. 3152 requires delivery of the pledged property to the pledgee, just as delivery is necessary to negotiate a bearer instrument. LSA-R.S. 10:3-202(1).[1] The requirements of delivery and possession to effect and maintain a pledge are strict. Thus in our view the authorities cited by Mr. Greer do lend support to his position that the debtor may hold the instrument as agent for creditor.
Under LSA-C.C. Arts. 2985 and 2987, an agent may be appointed to perform legal acts that the principal himself has the authority to do. See Craft v. Trahan, 351 So.2d 277 (La.App. 3d Cir. 1977). We find no restriction which would disqualify the maker of the note from being appointed such an agent to temporarily accept and hold the note for the payee. Mr. Greer's testimony at the trial was sufficient to support the trial court's finding that such an agency relationship did exist.
Finding an agency relationship between Mr. Greer and Mr. Mingledorff, we find that the appellants' argument that there was no acceptance of the note and mortgage by Mr. Greer is without merit. Mr. Greer's intent to accept both instruments is obvious by his preparation of both documents, his sending them to Mr. Mingledorff with instructions to sign the note and return the mortgage to him but to personally deliver the signed note. The note was accepted by Mr. Greer through his agent, Mr. Mingledorff.
We therefore hold that L. Edwin Greer's mortgage recorded January 5, 1979, primes those of the appellant creditors. We affirm the trial court's rankings as to Fund No. 1.
FUND NO. 2
We now address the ranking of mortgages and privileges against Fund No. 2 which is composed of Mr. Mingledorff's interest in the successions of his parents. Those having claims against Fund No. 2 in the amount of $31,693.50 as ranked by the trial court are as follows:
1. Mary Elizabeth Rogers Mingledorff (Weaks), by virtue of the judgment in the amount of $2,200 rendered on January 11, 1979;
2. The Ouachita National Bank in Monroe, by virtue of a lien arising from attachment filed on January 12, 1979, with a suit on a note which was eventually reduced to judgment;
3. Monroe Building and Loan Association, by virtue of a lien arising from attachment filed January 12, 1979, with a suit on a note which was eventually reduced to judgment;

*467 4. ISM, Inc., d/b/a O.K. Finance Company, by virtue of a lien arising from attachment filed January 12, 1979, with a suit on a note which was eventually reduced to judgment;
5. American Bank and Trust Company in Monroe, by virtue of its judgment rendered on March 6, 1979, and the subsequent garnishment of the successions on December 20, 1979; and
6. Mary Elizabeth Rogers Mingledorff (Weaks), by virtue of her judgment rendered on November 20, 1979.
The issues raised regarding Fund No. 2 are: (1) when a money judgment is filed prior to the running of suspensive appeal delays and subsequently no suspensive appeal is taken, how does this affect the rights of creditors acquired during the interim? (2) does such a recorded money judgment create a judicial mortgage upon the judgment debtor's interest in an unopened succession? and (3) what is the proper method of seizure of a debtor's interest in a succession?
LSA-C.C. Arts. 3322[2] and 3323[3] conclusively support appellee, Mrs. Mingledorff's (Weaks), position that in a case where a money judgment is recorded prior to the running of the suspensive appeal delays and no such appeal is taken, the judicial mortgage created by the recordation of the judgment relates back to the date on which the judgment was recorded.
Turning next to the question of the effect of Mrs. Mingledorff's (Weaks) judicial mortgage on the fund, the Louisiana Supreme Court recently explained that both seizin and ownership, though different, flow to the heir at the time of death, Baten v. Taylor, 386 So.2d 333 (La. 1979):
"The court of appeal ... mistakenly equated seizin with ownership. [footnote omitted] Seizin is not ownership, however, but the legal investiture of one class of heirs with possession of the succession upon the death of the deceased, enabling the heirs who acquire seizin, from the instant of death, to bring all the actions which the deceased could have brought. Lazarus, The Work of the Louisiana Appellate Courts for the 1971-72 Term, 33 La.L.Rev. 199, 201-02 (1973); 3 Marcade, Explication Du Code Civil no. 47, at 33 (7th ed. 1873) as cited in Lazarus, supra, at 202 n. 12. Ownership, on the other hand, is transmitted by operation of law at the moment of death to heirs and legatees designated by the Code, regardless of whether they have seizin of a particular succession or whether they can ever have seizin. [footnote omitted] For example, although a legatee under a particular title cannot acquire seizin, he has ownership of the thing bequeathed to him from the day of the testator's death. La. Civ.Code art. 1626. In order to be eligible for seizin, an heir must be either a forced heir, universal legatee or legitimate heir; and the latter two classes acquire seizin only in default of those preferred to them. Whether an heir acquires seizin depends, therefore, not on his ownership of succession property, but on whether he is a member of the class of heirs entitled to seizin of a particular succession according to the codal order of priority.
The redactors of the Code of 1825 made the distinction between ownership and seizin clear when they adopted the French system of succession, which embodies two different concepts: (1) Ownership rights of the heir are vested from the moment of the death, and, (2) seizin, the faculty of claiming and exercising possession, is acquired by either the forced heirs, the universal legatee or the legitimate heirs at the moment of death. Lazarus, supra, at 201; Comment, 49 Tul. *468 L.Rev. 1110, 1111 (1975); 1 Louisiana Legal Archives, Project of the Civil Code of 1825 at 115, In other words, as Planiol observes:
`Seizin has nothing to do with the transfer of property, which takes place immediately, whether it is in favor of heirs who have seizin, or who are deprived of it. It affects only the taking of possession of the estate, which takes place in two forms, one for the property in kind, the other for the rights of action.' 3 Planiol, supra § 1938, pp. 604-05." Id. at 339-340.
The Tableau of Distribution in the succession of Mr. Mingledorff's parents discloses that the majority (78%), of the succession assets were real estate. This real estate was sold and the entirety of Mr. Mingledorff's interest therein (including the interest in movables) was reduced to cash. This sum, in the amount of $31,693.58, was paid into the registry of the court. The ancient but still valid case of Smith v. Charles, 27 La.Ann. 503 (La.App.1875), squarely addresses the issue at hand:
"The heir being considered seized by the succession from the moment of its being opened, the right of possession, which the deceased had, continues in the person of the heir, as if there had been no interruption, and independent of the fact of possession; and each of the heirs becomes an undivided proprietor of the effects of the succession for the part or portion coming to him ... and the recording of a judgment against an heir was held to affect all the mortgageable property thus owned by such heir."
Also, LSA-C.C. Art. 3328 notes:
"The judicial mortgage may be enforced against all the immovables which the debtor actually owns or may subsequently acquire."
Thus Mr. Mingledorff's ownership vested in the real estate belonging to his parents at their death. The judgment of Mrs. Mingledorff (Weaks) is well below the value of his interest therein and is therefore properly ranked by the trial court as the superior privilege against Fund No. 2.
The final issue is whether the three creditors (Ouachita National Bank, Monroe Building and Loan Association, and ISM, Inc.), who attached Mr. Mingledorff's interest in his parents' unopened succession contemporaneously with their suits on notes, prime the claims of American Bank and Trust who garnished the succession under a writ of fieri facias subsequent to judgment, and that of Mrs. Mingledorff as a result of her judgment and judicial mortgage of November 20, 1979.
Having determined that the heir is vested with ownership of his interest in the deceased's succession at the moment of death, we find that this interest may be attached by creditors as was done here by Ouachita National Bank, Monroe Building and Loan Association and ISM, Inc., d/b/a O.K. Finance. Our conclusion is buttressed by the holdings in First National Bank and Trust Co. of Vicksburg v. Drexler, 171 So. 151 (La.App. 2d Cir. 1936); Van Der Kar v. Stead, et al, 21 So.2d 111 (La.App. 1st Cir. 1945); Jackson-Hinds Bank v. Davis, 244 So.2d 633 (La.App. 4th Cir. 1971). All of these cases stand for the proposition that an heir's creditor may seize that heir's interest in a succession by attachment of that interest. As explained in Jackson, what is seized is not the property of the succession but rather is the heir's interest in the succession. Such is the case here. The creditors have attached the heir's interest in his parents' succession. There is no attachment of succession property, therefore, there is no need to open a succession. By attaching an heir's interest the creditors merely put themselves in the position of receiving whatever interest the heir has and receiving that interest whenever the heir would have received it. Since only the proprietary interest of Mr. Mingledorff and not succession property is attached, it matters not that the succession was unopened at the time the attachments were made. See First National Bank and Trust Co. of Vicksburg, supra.
*469 Thus under LSA-C.C.P. Art. 2292[4] the creditors acquired a privilege which gives them a superior claim to Mr. Mingledorff's interest in his parents' succession. We therefore affirm the trial court's ranking of the privileges of Ouachita National Bank, Monroe Building and Loan Association, and ISM, Inc., d/b/a O.K. Finance, respectively as inferior only to the judicial mortgage of Mrs. Mingledorff (Weaks) which was recorded on January 11, 1979. We affirm the trial court's rankings as to Fund No. 2.
Thus the entire judgment of the trial court is affirmed at appellants' cost.
AFFIRMED.
Before PRICE, HALL, MARVIN, FRED W. JONES and SEXTON, JJ.

ON REHEARING
SEXTON, Judge.
A rehearing was granted in this case to reconsider our original opinion, particularly with respect to Fund No. 1. Upon reconsideration, we adhere to our original decision affirming the district court judgment as to both Fund No. 1 and Fund No. 2, essentially for the same reasons expressed in the original opinion.
For clarification, we point out that in discussing the trial court's reasons for judgment we did not hold or intend to hold that a "hand note" is essential to confection of a collateral mortgage "package." A hand note is usually but not necessarily present in a collateral mortgage transaction. The principal point in the original opinion was that, in addition to a mortgage and note, there must be a third element, a pledge of the mortgage note, to create a collateral mortgage which would rank only from the date the mortgage note is pledged.
We continue to emphasize that there were no elements of pledge involved in this transaction, thus precluding characterization of the mortgage as a collateral mortgage with the resulting ranking effect as urged by appellants. This mortgage securing a note evidencing a debt for specific fees and anticipated costs without any elements of pledge must be categorized as a conventional mortgage, ranking from date of recordation.
Since the original opinion viewed the mortgage as clearly not a collateral mortgage, the central point of concern in the original opinion, consistent with the issue presented by appellants' specifications of error, was the issue created by the temporary retention of the note by the maker, rather than the kind of mortgage involved. We adhere to the views expressed in the original opinion on that issue, holding that the general codal rule of ranking the mortgage from the date of recordation is not altered under the particular facts of this case where the maker, pursuant to express instructions from the intended holder and owner of the note, mailed the mortgage to the creditor but maintained possession of the note for the holder and owner's account for a few days until physical delivery could be accomplished in the ordinary course of the practicalities of the situation.
For clarification, reference to the "payee" of the note in our discussion of this issue should have been to "holder and owner" of the note.
As clarified, our original opinion and judgment is reinstated as the judgment of this court.
FRED W. JONES, J., dissents in part and concurs in part, and assigns written reasons.
PRICE, J., dissents in part and concurs in part for the reasons assigned by FRED W. JONES, J.
*470 FRED W. JONES, Judge, dissenting in part and concurring in part.
I disagree with the conclusion of the majority, on rehearing, that our original opinion was correct in holding that the Greer lien primed other liens affecting Fund No.1.
At the hearing on the rule filed by Mrs. Mingledorff to rank the mortgages and liens affecting this fund, the only witness to testify concerning the circumstances surrounding the confection of the promissory note and mortgage by Mingledorff on December 29, 1978, was Greer, the holder of the promissory note.
Greer, a Shreveport attorney, stated that in October 1978 he agreed to represent Mingledorff, a Monroe resident, in connection with a pending federal criminal investigation and any subsequent prosecution for a fee of $25,000, payable in three installments of $7500 each, with the first due on November 1, 1978, the second on November 15, 1978, and the third when Greer began to prepare for trial. Mingledorff paid Greer $7600 on November 1, 1978, but made no subsequent payments.
Greer further testified that on or about December 21, 1978, Mingledorff telephoned him from California and asked Greer if he would wait and take the balance of his legal fee ($14,900) out of the proceeds from the sale of Mingledorff's Monroe residence, which was on the market at that time. When Greer responded in the affirmative, the parties agreed that Greer would prepare and mail to Mingledorff a promissory note in the principal amount of $25,000, to cover the $14,900 indebtedness for legal services and all expenses that might be incurred in connection with a criminal trial, accompanied by a mortgage for the same amount covering Mingledorff's Monroe residential property, to secure payment of the note. However, in his testimony Greer explained that if the U.S. Attorney's office declined to prosecute his client, Mingledorff would not owe the final $7500 installment.
Consistent with the parties' understanding, Greer prepared and mailed to Mingledorff a promissory note for $25,000, payable to Future Holder, due on demand, bearing 8% per annum interest from date, together with a mortgage identified therewith covering the Monroe residential property. Greer instructed Mingledorff by telephone to complete both instruments in accordance with his directions and mail the mortgage back to Monroe for filing and recordation. However, since the promissory note was bearer paper and could possibly be lost in the mail, Mingledorff was requested to hold that instrument in his possession until he returned to Monroe.
Mingledorff apparently executed the promissory note and mortgage on December 29, 1978. The mortgage was mailed back and recorded in the office of the Ouachita Parish Clerk of Court on January 5, 1979. Mingledorff retained the promissory note in his possession until he returned to Monroe later in January 1979, at which time he gave the instrument to David McCormick, a friend of Greer. McCormick testified that he held the note until the spring of 1980 when he turned it over to Greer's legal counsel in this proceeding.
At the time of the trial of this rule, Greer stated that Mingledorff owed him $17,232.60 for legal services rendered and expenses incurred in connection with the federal criminal charge.[1]
Applicable Law
The Louisiana Civil Code recognizes two kinds of conventional mortgagesthe ordinary conventional mortgage granted to secure a specific debt[2] and the mortgage to secure future advances.[3] These mortgages are accessorial obligations, dependent upon *471 underlying valid obligations for their existence.[4]
The conventional mortgage granted to secure a specific debt ranks with reference to other mortgages from the time of its recordation.[5] Where the mortgage is given to secure future advances (or future obligations) and the advances are in fact made, that mortgage has a retroactive effect to the time of the contract and is likewise ranked as of the time of its recordation.[6]
It was held in Thrift Funds Canal, Inc. v. Foy, 261 La. 573, 260 So.2d 628 (1972) that:
"... [i]n order to secure a future debt, a mortgage need not express on its face that it is given for future advances. It may be phrased as security for an existing debt, when no debt in fact exists, and yet secure a later debt in accordance with the intention of the parties."
In Pickersgill & Co. v. Brown, 7 La.Ann. 297 (1852) the mortgage was drafted in terms of an existing debt, but was actually given partly for an existing debt and partly for later advances. The court classified the mortgage as one for future advances. Also see Hortman-Salmen Co. v. White, 168 La. 1057, 123 So. 711 (1929).
In addition to the two described conventional mortgages, Louisiana jurisprudence has created a third categorythe collateral mortgage, which represents an unusual blend of pledge and mortgage.[7] It seems to be generally agreed that the purpose of the collateral mortgage package is to confect a mortgage note that can be pledged as collateral security for either a pre-existing debt, for a debt created contemporaneously with the mortgage, for a future debt, or for a combination of these. The collateral mortgage note or "ne varietur" note is not the evidence of the indebtedness, but is merely the security that will be pledged as collateral for the true debt, which is often but not necessarily evidenced by a "hand note." Unlike the other two conventional mortgages, the collateral mortgage ranks only from the time that the collateral mortgage note is issued or pledged to secure a debt. Tallulah Production Credit Assn. v. Turner, 391 So.2d 885 (La.App. 2d Cir. 1980).
The fact that both the future-advances mortgage and the collateral mortgage can be used to secure future advances or future obligations has been a source of considerable confusion. Attempting to draw a line of demarcation between the two kinds of instruments, the court in Cameron Brown South, Inc. v. East Glen Oaks, Inc., 341 So.2d 450 (La.App. 1st Cir. 1976), found that a construction mortgage was a future-advances mortgage rather than a collateral mortgage because it provided for specific future advances.[8] On the other hand, the collateral mortgage is generally used to secure future advances of an unspecific variety.
To summarize, generally, as explained in Thrift Funds Canal, Inc. v. Foy, supra, a *472 mortgage for a specific debt is a mortgage given to secure a particular, existing debt; a mortgage for future advances is a mortgage given to secure a debt not yet in existence; a collateral mortgage is a mortgage designed, not to directly secure an existing debt, but to secure a mortgage note pledged as collateral security for a debt or a succession of debts, with the mortgage usually drawn in favor of future holders.
Applicability of Law to Facts of the Case
Against this background of the Louisiana law dealing with conventional mortgages covering immovable property, we direct our attention to the mortgage in question securing the $25,000 promissory note held by Greer.
On its face this mortgage secured a bearer note evidencing a specific debt then in existence. However, Greer stated that Mingledorff only owed him $14,900 at the time he signed the note and mortgage. Therefore, this was obviously not a conventional mortgage securing a specific existing indebtedness. As a matter of fact, Greer testified that the note represented a then existing, fixed indebtedness together with possible future obligations. This leads us to the critical questionis the mortgage one for future advances, subsequently actually made, (ranking from time of recordation) or is it a collateral mortgage (ranking from time of pledge of the note)?
As previously noted, our jurisprudence recognizes that a future-advances mortgage may secure both an existing debt and a future debt. However, it seems clear that, to fall into this category of conventional mortgage, the instrument must secure specific future advances. In this case there is some question as to whether Greer, who was not named as mortgagee in the mortgage nor as payee on the note, was obligated to make any future advances or render other services in the future. Be that as it may, the substance of Greer's testimony was that any future advances were indefinite and non-specific. In fact, at the time of the trial, when Greer's representation of Mingledorff in the federal proceeding had evidently terminated, Mingledorff only owed Greer $2,332.60 over and above the $14,900 indebtedness existing when the note and mortgage were executed. Consequently, the instrument in question may not, under our law, be categorized as a future-advances mortgage.
Having engaged in this process of elimination, I conclude that this mortgage, given to secure existing and future indebtedness, is a collateral mortgage. Although not containing the customary language stipulating that the note and mortgage were intended to constitute integral parts of a collateral mortgage package, it is significant that the note is bearer paper made payable on demand. Further, I glean from Greer's testimony that the $25,000 note itself was not meant to evidence the existing indebtedness (fixed) and future indebtedness (indefinite), but was designed to secure that indebtedness.
Concluding that the $25,000 note held by Greer is secured by a collateral mortgage, it follows under our law that the mortgage in question ranks as of the time that the note was issued or pledged by Mingledorff to secure his indebtedness to Greer. McCormick testified that he received the note on Greer's behalf from Mingledorff when the latter returned to Monroe from California sometime in January 1979. I gather that the pledge of this collateral mortgage note occurred subsequent to January 11, 1979 (date of recordation of Mrs. Mingledorff's $2200 judgment), but the record is not clear on this point. Regardless, it was Greer's burden to establish that the collateral mortgage note held by him was pledged at a time in January prior to the recordation of the other liens recorded that montha burden which he failed to discharge.
For the reasons explained, I find that the trial court erred in finding that the $25,000 mortgage note held by Greer primed the liens of Monroe Building and Loan Association, ISM, Inc. and Mrs. Mingledorff. Insofar as the majority holds otherwise, I respectfully dissent.
I concur in the majority opinion insofar as it affirms the trial judge's ranking of *473 liens affecting Fund No. 2, simply noting that a mortgage of this nature affects only the residuum of the mortgageable property accruing to the heir [whose interest in the immovable property of the unopened succession is burdened by the judicial mortgage] after all succession debts are settled. Succession of Tureaud v. Gex, 21 La.Ann. 253, 255 (1869).
DISSENTING IN PART AND CONCURRING IN PART.
PRICE, Judge, dissenting in part and concurring in part.
I concur in the majority opinion insofar as it affirms the trial judge's ranking of liens affecting Fund No. 2 is concerned. I must respectfully dissent from the majority opinion holding that the Greer mortgage primes other liens relating to Fund No. 1 for the reasons assigned by Judge Fred W. Jones.
NOTES
[1] LSA-R.S. 10:3-202. Negotiation

(1) Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary endorsement; if payable to bearer it is negotiated by delivery.
[2] LSA-C.C. Article 3322. Effective date of judicial mortgage

The Judicial Mortgage takes effect from the day the Judgment is recorded in the manner hereinafter directed.
[3] LSA-C.C. Article 3323. Effect of appeal from judgment

If there be an appeal from the judgment and it is confirmed, the mortgage relates back to the day when the judgment was recorded.
[4] LSA-C.C.P. Article 2292. Privilege of creditor on seized property; successive seizures

The seizing creditor, by the mere act of seizure, acquires a privilege on the property seized, which entitles him to a preference over ordinary creditors.
When several seizures of the same property are made by ordinary creditors, the seizing creditors acquire a privilege and are entitled to a preference among themselves according to the order of their seizures.
[1] Greer explained that, although he worked out a plea bargain for Mingledorff with the office of the U.S. Attorney and, consequently, did not have to go to trial, Mingledorff understood that the third or last fee installment of $7500 was owed since Greer had completed preparations to try the case.
[2] La.Civil Code Article 3290.
[3] La.Civil Code Article 3292.
[4] La.Civil Code Article 3284.
[5] La.Civil Code Article 3329.
[6] La.Civil Code Article 3293.
[7] For an excellent discussion of this subject see Nathan and Marshall, The Collateral Mortgage, 33 La.L.Rev. 497 (1973).
[8] As Nathan and Marshall pointed out in the cited law review article, p. 524, "the classic example of the ordinary mortgage to secure future advances is the agreement of a lending institution to advance funds in connection with the construction of a building; for example, homestead A agrees to advance $50,000 for the construction of a house on property belonging to B, where B has entered into a building contract for the construction of the house by contractor C. The building contract provides for stage payments to the contractor, as the slab is poured, the roof constructed, the electrical and plumbing roughed in, and so forth. Homestead A agrees that it will advance the funds and make payments to the contractor as the various stages are met and certified as having been completed. Homestead A may take a mortgage on B's property at the same time that it commits itself to advance funds for the construction of the house.... As each stage is completed by contractor C, homestead A advances to him the funds for that stage, and under the provisions of article 3292 and 3293 of the Civil Code, the advances made by the homestead are secured by the mortgage originally granted and each advance relates back to the original date of the mortgage."