SOUTH LAFOURCHE BANK &
TRUST COMPANY

v.

M/V SOUTHERN STAR, etc., et al.

Civ. A. No. 82–3413.

United States District Court,
E.D. Louisiana,
Section M.

March 8, 1984.

George J. Ledet, Jr., Cut Off, La., for plaintiff.

George J. Higgins, Jr., New Orleans, La., for Lee's Trawl Boards, Inc., Lafourche Shipyard, Inc. and Kief Hardware, Inc.

H. Harwell Herrin, Golden Meadow, La., for Mid-Gulf Ice Inc. and Gulf Shrimp Processors, Inc.

Sidney L. Patin, Houma, La., for A–N–S Engines, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

This case presents a question of ranking between a preferred marine mortgage and several intervening maritime liens. To

ease in the analysis of the somewhat confusing sequence of financial security instruments executed by the parties to this suit, a brief narrative summary of what occurred is in order. A more detailed account of the facts follows.

Calvin P. Thibodaux wanted to purchase a vessel. The South Lafourche Bank and Trust agreed to finance the purchase but required security from Thibodaux and his wife in the form of a collateral mortgage on their home and a preferred marine mortgage on the vessel. The bank also required corresponding *"ne varietur"* promissory notes marked for identification with these various mortgages. No funds were advanced on these instruments as they were to act as security for the actual debt which was represented by a promissory note (hand note) executed the following day by Thibodaux's corporation (Calvin P. Thibodaux, Inc.). This note was endorsed by the Thibodauxs and indicated on its reverse that it was secured by a pledge of the collateral home mortgage and the preferred marine mortgage.

The note matured in just under a year, at which time it apparently could not be paid by Thibodaux. As a result, the debt was refinanced and represented by a new note. This refinancing occurred on several more anniversaries of the loan until the bank foreclosed on both the collateral home mortgage and the preferred marine mortgage on the vessel.

The following facts have been stipulated to by all of the parties:

1. On January 4, 1978, Calvin P. Thibodaux purchased the M/V SOUTHERN STAR for the sum of One Hundred Eighty-five Thousand Dollars ($185,000.00) from Southern Star, Inc.

2. On January 4, 1978, Calvin P. Thibodaux executed a promissory note payable to the order of "myself," payable at South Lafourche Bank & Trust Co., Larose, Louisiana, in the full sum of One Hundred Eighty-five Thousand Dollars ($185,000.00). The note was paraphed for identification with an Act of Preferred Marine Mortgage described below.

3. On January 4, 1978, Calvin P. Thibodaux executed a document entitled Preferred Ship Mortgage in the sum of One Hundred Eighty-five Thousand Dollars ($185,000.00), in favor of South Lafourche Bank & Trust Co., which mortgage purported to grant a security interest in the M/V SOUTHERN STAR.

4. On January 4, 1978, Calvin and Irene S. Thibodaux executed a promissory note payable to the order of "myself," payable at South Lafourche Bank & Trust Co., in the amount of Forty-five Thousand Dollars ($45,000.00). This note was paraphed for identification with an Act of Collateral Mortgage described below.

5. On January 4, 1978, Calvin and Irene S. Thibodaux executed a Collateral Mortgage on property located in Cut Off, Louisiana, said property being the Thibodaux's home. This mortgage was in the amount of Forty-five Thousand Dollars ($45,000.00) and was executed in favor of South Lafourche Bank & Trust Co. This mortgage on their home was granted as additional security for the purchase of the M/V SOUTHERN STAR, as Calvin and Irene S. Thibodaux had no down payment to place for the purchase of the vessel.

6. On January 5, 1978, Calvin P. Thibodaux, Inc. (the corporation) executed a promissory note in the amount of Two Hundred Five Thousand, Five Hundred Dollars ($205,500.00), payable to the order of South Lafourche Bank & Trust Co. The reverse side of the note contained the following language:

"Secured by pledge of collateral mortgage note in the amount of $45,000.00, dated 1–4–78. Also secured by pledge of a preferred marine mortgage note in the amount of $185,000.00 dated 1–4–78, due on demand."

This note was endorsed by Calvin and Irene Thibodaux.

7. The proceeds of a loan in the amount of One Hundred Eighty-five Thousand Dollars ($185,000.00) were deposited into Account # 216–267 at the South Lafourche Bank & Trust Co. on January 4, 1978. The account was in the name of "Calvin P. Thibodaux, Inc."

8. No funds were ever advanced on either of the *"Ne Varietur"* notes described above in paragraphs 2 and 4.

9. The document entitled Preferred Marine Mortgage described above was received by the United States Coast Guard on January 6, 1978, and was recorded in the appropriate registry. This mortgage was endorsed on the documents of the vessel on January 11, 1978, providing for a discharge amount of One Hundred Eighty-five Thousand Dollars ($185,000.00).

10. On January 3, 1979, Calvin P. Thibodaux, Inc. (the corporation) executed a promissory note payable to the order of South Lafourche Bank & Trust Co., in the amount of Two Hundred One Thousand, Nine Hundred Ninety-nine Dollars and Thirty Cents ($201.999.30). The note was personally endorsed by Calvin and Irene S. Thibodaux and was used to refinance or pay the balance due on the promissory note which had been executed on January 5, 1978, by the corporation, Calvin P. Thibodaux, Inc., in the amount of Two Hundred Five Thousand, Five Hundred Dollars ($205,500.00). (See paragraph 6 above.) The reverse of this refinancing note contained the following language:

> "Secured by pledge of a Collateral Mortgage Note in the names of Calvin P. Thibodaux and Irene S. Thibodaux in the amount of $45,000.00 dated January 4, 1978; house and lot in Cut Off, La. Also secured by a pledge of a Preferred Marine Mortgage note in the name of Calvin P. Thibodaux, in the amount of $185,000.00 dated January 4, 1978 due on demand. M/V Southern Star."

11. On January 14, 1980, Calvin P. Thibodaux, Inc. (the corporation) executed a promissory note in the amount of One Hundred Ninety-four Thousand, Four Hundred Thirteen Dollars and Sixty-five Cents ($194,413.65) payable to the order of South Lafourche Bank & Trust Co. This note was personally endorsed by Calvin and Irene S. Thibodaux and was used to refinance or pay the balance due on the promissory note described in paragraph 10

above. The reverse side of the note contained the following language:

> "Payment of this debt is secured by Collateral Pledge Agreement No. 088 dated January 14, 1980. House and lot in Cut Off and M/V SOUTHERN STAR."

12. On January 14, 1980, Calvin P. Thibodaux, Inc. (the corporation) executed a "Collateral Pledge Agreement # 088," said agreement purported to evidence the pledge of the two *"Ne Varietur"* notes to secure the note described in paragraph 11 above.

13. On January 2, 1981, Calvin P. Thibodaux, Inc. (the corporation) executed a promissory note payable to the order of South Lafourche Bank & Trust Co., in the amount of One Hundred Seventy-one Thousand Dollars ($171,000.00). This note was personally endorsed by Calvin and Irene S. Thibodaux, and was used to refinance or pay the balance due on the note described in paragraph 11 above. The note contained the following language on the reverse side:

> "Payment of this debt is secured by a Collateral Pledge Agreement No. 088 dated January 14, 1980. On House and Lot in Cut Off and M/V Southern Star. Purpose of this loan is renewal of notes."

14. On February 4, 1982, Calvin P. Thibodaux, Inc., executed a promissory note payable to the order of South Lafourche Bank & Trust Co., in the amount of Six Thousand, Two Hundred Eighty-eight Dollars and Fifty-six Cents ($6,288.56). On the reverse of this note was the following language:

> "Payment of this debt is secured by Collateral Pledge Agreement No. 088 dated 1–14–80. Coll. mtg. note dated 1–4–78 in the amt. of $45,000.00. Preferred Marine Mtg. dated 1–4–78 in the amt. of $185,000.00."

15. From September 20, 1979 to February 24, 1981, intervenor, A–N–S Engines, Inc., furnished and supplied the M/V SOUTHERN STAR with certain necessaries in the amount of $13,654.83.

16. From August, 1981 to January 5, 1982, intervenor, Gulf Shrimp Processors,

furnished and supplied the M/V SOUTH-ERN STAR with certain necessaries in the amount of $798.77.

17. From October, 1980 to July 8, 1982, intervenor, Mid-Gulf Ice, Inc., furnished and supplied the M/V SOUTHERN STAR with certain necessaries in the amount of $4,173.36.

18. On or about November 6, 1980, intervenor, Lee's Trawl Boards, Inc., furnished and supplied the M/V SOUTHERN STAR with certain necessaries in the amount of $1,603.90.

19. From May 2, 1979 to July 31, 1982, intervenor, Kief Hardware, Inc., furnished and supplied the M/V SOUTHERN STAR with certain necessaries in the amount of $7,417.97.

20. From January 5, 1980 to June 5, 1981, intervenor, Lafourche Shipyard, Inc., furnished and supplied the M/V SOUTH-ERN STAR with certain necessaries in the amount of $11,608.42.

21. Calvin P. Thibodaux, Inc. and the Thibodauxs personally defaulted on their obligations to the bank. The bank foreclosed on both the collateral mortgage on the house and lot in Cut Off, Louisiana (described above in paragraph 5) and the Preferred Ship Mortgage (described in paragraph 3). On September 15, 1982, the bank was the highest bidder for the vessel M/V SOUTHERN STAR at the United States Marshal's sale.

22. Intervenors described in paragraphs 15–20 now challenge the validity of the Preferred Ship Mortgage and each asserts a priming maritime lien over any security interests claimed by the bank.

## Conclusions of Law

1. The court has jurisdiction over this matter pursuant to the Ship Mortgage Act, 46 U.S.C.A. §§ 951 and 954.

2. In resolving this ranking problem, a review of the various types of mortgages available under Louisiana law and the steps required to perfect these mortgages might be helpful. Mortgages are of three types: conventional, legal and judicial. La.Civ.Code art. 3286. Within the area of conventional mortgages, three different forms of mortgages are recognized by the Louisiana statutes and jurisprudence: an "ordinary mortgage" (La.Civ. Code arts. 3278, 3290); a mortgage to secure future advances (La.Civ.Code arts. 3292, 3293); and a collateral mortgage. An "ordinary mortgage" or a mortgage for a specific debt is a mortgage given to secure a particular, existing debt. A mortgage for future advances is a mortgage given to secure a debt not yet in existence. Finally, a collateral mortgage is a mortgage designed, not to directly secure an existing debt, but to secure a mortgage note pledged as collateral security for a debt or a succession of debts.

3. The collateral mortgage requires that at least three documents be executed. The first is an act of mortgage, usually labeled the collateral mortgage. This mortgage secures a contemporaneously drafted promissory or *"Ne Varietur"* note which is paraphed for identification with the mortgage. In an ordinary type of mortgage, this note represents the debt and is the instrument upon which monies are lent. In the collateral mortgage situation, however, this note and its corresponding collateral mortgage are both pledged as security for a debt that is represented by a third note or a series of notes.

4. Two key distinctions must be made between the collateral mortgage situation and the mortgage to secure a specific debt. The first distinction involves the ranking of the mortgage. An ordinary mortgage ranks from the date it is filed in the mortgage office. A collateral mortgage does not receive its ranking from the time it is filed, but from the time of issuance, *i.e.* when the *"Ne Varietur"* note is pledged to secure the debt.

The second critical difference between these types of mortgages involves the effect of extinguishment of the debt. The ordinary conventional mortgage is made to secure a specific debt, and the mortgage is identified with that debt so that when the

debt is paid, the mortgage expires. La.Civ. Code art. 3285. This is so because the mortgage is an accessorial obligation which relies upon the strength of the principal obligation, *i.e.* the debt, for its survival. La.Civ.Code art. 3284. The collateral mortgage, on the other hand, differs in this regard because of its interesting relationship with the laws of pledge. Once the collateral mortgage and the *"Ne Varietur"* notes are pledged to a creditor, an advance or series of advances can be made as represented by hand notes. The debtor can reduce these notes or even pay them in full, and additional advances can be made, all retaining the ranking date of the first advance. See, *e.g.*, *New Orleans Silversmiths, Inc. v. Toups*, 261 So.2d 252 (La. App. 4th Cir.1972).

█ 5. This retrospective ranking of subsequent advances made pursuant to a collateral mortgage is afforded by article 3158 of the Civil Code. This article states that instruments pledged to secure a specific debt or future advances (by the same creditor), which remain in the hands of that creditor, may be repledged to secure renewals of the original loan, even though the original loan has been reduced or paid up to the total limit of the original pledge. The provisions of article 3158 do not come into play, however, until certain prerequisites are met: (1) the initial pledge must be properly confected, with the parties mutually agreeing at the time that the pledge will secure obligations or liabilities thereafter arising; (2) each succeeding loan must be specifically secured by a pledge of the original collateral; (3) the collateral must continuously remain in the hands of the pledgee; and (4) the parties must act in good faith at all times. See Nathan and Marshall, *The Collateral Mortgage*, 33 La. L.Rev. 497, 523 (1973).

6. Finally, to complete our review of the characteristics of the various types of mortgages, two other devices should be mentioned. The first also arises under Louisiana law and involves a mortgage which has been tailored to apply to movables. Such an instrument is called a chattel mortgage and the formal requirements necessary to perfect such a mortgage are found in La.R.S. 9:5351 *et seq.*

█ 7. The last type of mortgage which we need consider is not a creature of Louisiana law but of federal statutory law. United States Code title 46, section 922 *et seq.* sets forth the statutory guidelines for perfecting a preferred mortgage on a vessel. A properly confected preferred ship mortgage grants to the mortgagee a lien which has priority over all claims against the vessel, except preferred maritime liens and court costs.

8. On September 15, 1982, the South Lafourche Bank and Trust was the highest bidder for the vessel M/V SOUTHERN STAR at a U.S. Marshal's sale. At that time, the bank represented to the court that it had a valid first preferred mortgage on the vessel, and on that basis requested and obtained leave to bid up to the amount of their mortgage on credit. Intervenors, all corporations who supplied necessaries to the vessel, now assert claims to the proceeds of this sale, contending that the preferred ship mortgage was invalid.

█ 9. As mentioned previously, the preferred ship mortgage is a federally created security device and the formalities required in perfecting such a mortgage are found in 46 U.S.C. § 922. In order to achieve preferred status under the act, the mortgage must:

1) be endorsed upon the vessel's documents;

2) be recorded as provided in 46 U.S.C. § 921, together with the time and date of endorsement;

3) be accompanied with an affidavit of good faith;

4) not stipulate that preferred status is waived;

5) be granted in favor of a citizen of the United States.

█ 10. The record before the court indicates that each of these prerequisites were complied with as required by the statute. Intervenors argue that 46 U.S.C.

§ 838 requires that before the mortgage can properly be recorded, a written declaration of citizenship must be filed. They contend that because the bank failed to file such a declaration, the mortgage is invalid. I can not agree.

Section 838 of the Shipping Act is a general proviso governing citizenship declarations for bills of sale, hypothecations, conveyances and mortgages of any vessel. The requirements of this statute must yield to the specific requirements expressly enumerated in section 922 of the same Act. This section requires only that the mortgagee be a citizen of the United States and that the mortgage be recorded in compliance with section 921 which has no citizenship declaration. The court finds that the bank had a valid preferred ship mortgage granted by Calvin P. Thibodaux and effective as of the date of its filing.

11. The real questions before this court, however, are whether this preferred ship mortgage, granted by an individual, was viable security for a corporation's debt, or whether the mortgage itself was extinguished because it was a mortgage to secure a specific debt which never came into existence or at some time ceased to exist. In other words, the central focus of this inquiry pivots upon how this court categorizes this preferred ship mortgage, *i.e.* was it a mortgage to secure a specific debt or was it used merely as security in a collateral mortgage situation to secure future financing?

12. To address the first issue mentioned above, the Louisiana Civil Code provides that a mortgage granted by one party, may be validly pledged as security for the debt of another. Article 3295 reads:

"It is not necessary that the mortgage should be given by the person contracting the principal obligation; it may be given for the contract of a third person."

Intervenors cite *First Guaranty Bank v. Alford*, 366 So.2d 1299 (La.1978), as authority for the contention that the corporation could not assert a security interest in the mortgage of Calvin Thibodaux, the individual. In *Alford*, Mrs. Alford pledged a collateral mortgage note indicating that it was to secure a $150,000 hand note executed by her husband. Subsequent to this original pledge, the hand note was cancelled and the debt was refinanced several times, each succeeding note indicating that it was secured by the original collateral pledge agreement. The court held that because Mrs. Alford was not a signatory on any of the renewal notes, the bank could not assert a security interest in instruments executed by her husband alone.

13. The case at bar, however, is easily distinguishable from *Alford*. While it is true that the collateral home mortgage was signed by Thibodaux and his wife and the preferred ship mortgage was signed only by Thibodaux, all subsequent renewal notes refinancing the debt were signed by Thibodaux, his wife and the corporation. Because La.Civ.Code art. 3295 permits one party to pledge his security for another, and all three parties authorized each renegotiation of the debt, intervenors' contention that the bank could not claim a perfected security interest is without merit.

14. Intervenors next allege that the debt which was originally used to secure the mortgage had extinguished, and accordingly, could not be revived by the subsequent pledge of these notes. The keystone of this argument, from intervenors' point of view, is the contention that at the time the preferred ship mortgage was granted, the parties intended only to secure a specific debt—a loan to purchase the M/V SOUTHERN STAR. They contend that the creditor bank now attempts to lift themselves by their own bootstraps, claiming that they would not have renegotiated the debt had the parties not intended this to be a collateral mortgage situation.

15. The difficulty in resolving this dispute arises in part from the Louisiana Supreme Court's decision in *Thrift Funds Canal, Inc. v. Foy*, 261 La. 573, 260 So.2d 628 (1972). In that case, the court addressed the problem of determining whether a mortgage was one to secure a specific debt or to secure future advances and concluded:

"It is true that, in order to secure a future debt, a mortgage need not express on its face that it is given for future advances. It may be phrased as security for an existing debt, when no debt in fact exists, and yet secure a later debt in accordance *with the intention of the parties.*" (Emphasis added.)

260 So.2d at 631, *citing Hortman-Salem Co. v. White,* 168 La. 1057, 123 So. 711 (1929). *See also Pickersgill v. Brown,* 7 La.Ann. 297 (1852). Notwithstanding this language, the court concluded that the parties had intended only to secure an existing debt and applied the Louisiana law that "after a mortgage note for a specific debt has been paid, the mortgage is extinguished. No later advance on the note can revive the mortgage." 260 So.2d at 682. La.Civ.Code 3285. *See also Odom v. Cherokee Homes, Inc.,* 165 So.2d 855 (La.App. 4th Cir.1964); and *Acadiana Bank v. Foreman,* 352 So.2d 674 (La.1977).

16. Thus, under the mandate of the court in *Thrift Funds Canal, supra,* we look to the intent of the parties to determine our characterization of the mortgage. There is no specific form or language needed to perfect a collateral mortgage. Intervenors' argument that the mortgage fails because it lacked certain "required language" and was too ambiguous might apply to chattel mortgages (intervenors cite the statutory requirements of La.R.S. 9:5352) but not collateral mortgages. If these parties intended to pledge a valid preferred ship mortgage as part of a collateral mortgage to secure future advances, this court knows of no reason not to approve it. *See Southland Financial Corporation v. Oil Screw Mary Evelyn,* 248 F.Supp. 520 (E.D.La.1965).

17. The financial transactions which we now scrutinize took place in two phases. On January 4, 1978, Thibodaux executed a preferred ship mortgage and, along with his wife, a collateral mortgage on his home. The parties have stipulated that no funds were advanced on these instruments.

The following day, the corporation and the Thibodauxs pledged the instruments executed the previous day as security for a third note. All three parties endorsed this note, which contained the written formalities of the pledge on its reverse. At this time, the bank deposited the proceeds of the loan into the corporation's account. The pledged instruments never left the hands of the bank.

Under these circumstances, it appears that a collateral mortgage financing scheme was intended and, in fact, perfected. The fact that the mortgage on the Thibodauxs' home was captioned a "collateral" mortgage clearly indicates that the parties were not contemplating a specific debt. It is probable that because a standard preferred marine mortgage form was used to prepare the vessel mortgage, the parties neglected to label this instrument as a collateral device. It goes without saying that had the bank been more careful in drafting this instrument, a great deal of time and expense might have been saved. Nevertheless, the fact that no funds were advanced on the *"Ne Varietur"* notes, the clear wording of the written pledge agreement on the reverse side of the hand note and the fact that funds were deposited in the corporate account in compliance with the hand note, leads one to the reasonable conclusion that this was a collateral mortgage situation.

18. Intervenors contend that the preferred ship mortgage was invalid because there was no consideration for the collateral mortgage and note when it was given on January 4, 1978. The ground for this assertion is that no money was loaned on these instruments. This same issue was dispensed with by the court in *Southland Financial Corporation v. Oil Screw Mary Evelyn, supra.* The *quid pro quo* for granting the mortgage is the promise to loan certain monies, at some time in the future, should certain conditions be met. While this concept is somewhat fictitious in the collateral mortgage sense, the underlying obligation is, nevertheless, a binding one.

19. Once we conclude that the financial dealings between the parties were based on

a collateral mortgage arrangement, it follows that the subsequent refinancings of the corporate hand note did not extinguish the debt and terminate the mortgage. *Acadiana Bank v. Foreman, supra,* at 676–7. Consequently, when the bank elected to foreclose on the preferred ship mortgage, it did so on a lien which outranked any and all maritime liens which arose after the date of the pledge of the original corporate hand note on January 5, 1978. The earliest recorded maritime lien on the vessel is in favor of intervenor A–N–S Engines, Inc. dated April 9, 1981.

Plaintiff is directed to prepare a judgment consistent with these findings.