352 So.2d 674 (1977)
ACADIANA BANK
v.
Kimball Aubrey FOREMAN et al.
No. 59800.
Supreme Court of Louisiana.
November 14, 1977.
Rehearing Denied December 14, 1977.
*675 David S. Cook, DeVillier & Ardoin, Eunice, for plaintiff-respondent.
Jacque B. Pucheu, Pucheu & Pucheu, Eunice, for intervenor-applicant.
DIXON, Justice.
This case involves the ranking of privileges on movables in a drive-in restaurant. The contest is between Acadiana Bank, which holds a chattel mortgage on the furniture and fixtures, and intervenor, Wilson J. Moosa, owner and lessor of the building. The trial court rejected the demands of the intervenor-lessor, holding that the bank's lien under the chattel mortgage was superior in rank. The Court of Appeal, with one judge dissenting, affirmed (343 So.2d 1138 (La.App.3d Cir. 1977)), and we granted writs to review that ruling.
Helen Doty operated a "Frostop" restaurant in Eunice in a building owned by Wilson J. Moosa. Kimball Aubrey Foreman and his wife arranged with Mrs. Doty and Moosa to take over the business. Mrs. Doty sold the movables to Foreman and his wife, who agreed with Moosa to rent the building for $160.00 a month through December 31, 1974. These agreements were completed on September 18, 1974, at which time a written lease was executed between the Foremans and Moosa for a period of five years at a rent of $400.00 a month, to begin on January 1, 1975. On the same day, September 18, 1974, the Foremans borrowed $12,000 from Acadiana Bank, evidenced by a hand note. The Foremans also executed a collateral mortgage on the equipment Mrs. Doty sold them, and pledged a collateral mortgage note in the amount of $17,000, to secure the hand note.
The officers of the Acadiana Bank participated in the arrangements, and were aware that the mortgaged property was in the building owned by Moosa and leased to the Foremans. The lease, which was to have commenced on January 1, 1975, was recorded on September 20, 1974. The collateral chattel mortgage was not recorded until October 3, 1974.
The indebtedness to the bank was reduced from $12,000 to $5000 by August 14, 1975. On that date Mrs. Foreman executed a $5000 hand note and delivered it to the bank; the September 18, 1974 note for $12,000 was apparently marked paid and returned to the Foremans.
Matrimonial difficulties between the Foremans resulted in a dissolution of their marriage later in 1975. Apparently, as a part of the settlement of the community property, arrangements were made, and the bank returned Mrs. Foreman's $5000 note to her on October 6, 1975, and took a note from Mr. Foreman on October 7, 1975 in the amount of $6234.24. Each note was secured by a continuing pledge of the collateral mortgage note, which never left the hands of the bank.
Foreman did not make the payments on the $6234.24 note dated October 7, 1975, and the bank proceeded to foreclose by executory process. Moosa intervened, contending that his lessor's lien and privilege for unpaid rent primed the bank's chattel mortgage.
The privilege of the chattel mortgage is effective as to third persons from the date of its recordation. R.S. 9:5354.[1]
Since it was recorded on October 3, 1974, the chattel mortgage primes only those liens arising thereafter. The oral lease between Moosa and Foreman, commencing on September 18, 1974 and ending December 31, 1974, gave the lessor a lien superior to that of the bank's chattel mortgage.
The questions, then, are (1) did Moosa's lien continue without interruption, even though the written lease superseded the oral lease on January 1, 1975? (2) did the bank's privilege arising from the chattel mortgage continue without interruption in spite of renegotiation of Foreman's indebtedness *676 during the term of the written lease?
The affirmative answer to the second question is supplied by C.C. 3158.[2] When a collateral chattel mortgage note is pledged to a creditor, and when the note remains in the hands of the creditor, to secure a particular loan or any other obligation, existing or thereafter arising (as provided in the chattel mortgage note in the instant case),[3] the pledge continues against third persons, and the new liabilities or *677 loans are "secured by the collateral to the same extent as if they came into existence when the instrument or item was originally pledged and the pledge was made to secure them . . ." C.C. 3158. New Orleans Silversmiths, Inc. v. Toups, 261 So.2d 252 (La.App. 4th Cir. 1972), cert. den. 262 La. 309, 263 So.2d 47 (La.1972), noted in 47 Tul.L.Rev. 211). Nathan and Marshall, "The Collateral Mortgage," 33 La.L.Rev. 497, 510; LeVan, "Security Devices," 33 La.L.Rev. 228.[4]
The answer to the first question, however, is negative. Except in cases of tacit reconduction, the life of the lessor's privilege, in effect, spans only the duration of the lease in existence when the privilege first attached, to secure only the rent arising under the lease. If one lease is superseded by another lease, the effectiveness of the old lessor's privilege ends and a new lessor's privilege arises.
(Tacit reconduction (C.C. 2688, 2689) is said to result in a continuation of the old lease and the security of the privilege. Comegys v. Shreveport Kandy Kitchen, 162 La. 103, 110 So. 104 (1926); McKesson Parker Blake Corp. v. Eaves & Reddit, Inc., 149 So. 294 (La.App. 1st Cir. 1933). This interpretation of the civil code provisions was criticized in "Tacit ReconductionA New Lease," Lapeyre, 1 La.L.Rev. 439).
In the absence of reconduction, however, the lessor's privilege is dependent upon a particular lease. The conflict between the privilege of the chattel mortgage and the lessor's privilege is discussed in "Problems of Chattel Mortgages," Dainow, 13 La.L.Rev. 537, 543:
"Lessor. The existence of the lessor's privilege is dependent upon two elements: (1) a lease between the parties, (Fisk v. Moores, 11 Rob. 279 (La.1845)) and (2) the presence of the effects in the premises. (Arts. 2705-2709, 3217(3), 3218, La.Civil Code of 1870). Accordingly, the earliest point of time when these two elements concur is the date on which the lessor's privilege arises. (Youree v. Limerick, 157 La. 39, 101 So. 864 (1924)). This is not dependent upon any rent being due, (Ibid.) the privilege is protection for a continuing relationship.
The lessor's privilege is predicated upon a lease; therefore, it must be a particular lease. Consequently, if either by agreement or operation of law there comes into existence a new lease, that also means a new privilege with a new date of creation. Thus, if the lessor and lessee (under a monthly lease for an indefinite term) agree upon a change in the rent, they are deemed to have made a new lease, (McGuffin v. Barkett, 44 So.2d 195 (La.App.1950); Weaks Supply Co. v. Werdin, 147 So. 838, and 154 So. 378 (La.App.1933, 1934), criticized in Note, 9 Tulane Law Review 124 (1934)) and the privilege deriving from the new lease cannot have a date of creation any earlier than the concurrence of the new lease and the presence of the effects on the premises. This means that a chattel mortgage which came into existence after the first lease but before the new lease thereby moves into first rank ahead of the lessor's privilege. (Cf. Easterling v. Brooks, 213 La. 519, 35 So.2d 132 (1948)).
In Youree v. Limerick, 157 La. 39, 101 So. 864 (1924), the operator of a restaurant borrowed money from Papas and gave his note, secured by a chattel mortgage on the furniture and fixtures. Limerick subsequently bought the business and assumed the obligations under the chattel mortgage, but arranged for the cancellation of the prior lease, and the execution of a new lease, apparently on the same terms. Since *678 these facts resulted in the superior rank of Papas' chattel mortgage, the court found it necessary to pass on the landlord's "plea of estoppel" (which was decided in favor of the landlord).
The three requisite elements to a contract of lease are the thing, the price, and the consent. C.C. 2670. It has been held that when by agreement the price is changed, there is a new price and a new consent, and therefore a new lease. Weaks Supply Co. v. Werdin, 147 So. 838 (La.App.2d Cir. 1933), affirmed, 154 So. 378 (La.App.2d Cir. 1934), criticized, 9 Tul.L.Rev. 124; Thigpen v. Wall Printing Corp., 145 So. 714 (La.App.2d Cir. 1933).
In Weaks, supra, a written lease was entered into at a monthly rate of $100 without a definite duration having been agreed upon. Some time later the monthly rental was reduced to $80 by verbal agreement. Before the rent was reduced the lessee executed a chattel mortgage. The court held that a new lease was created by the rent reduction even though no new written agreement was executed. The original lease would have primed the chattel mortgage, but the continuity of the lessor's privilege was broken when the new lease became effective; therefore, the chattel mortgage prevailed. In Thigpen, supra, after the lessee had stayed on the premises on a month-to-month basis after expiration of the lease's three year term, a new lease was executed for the same rental and same duration. A chattel mortgage recorded during the period the first lease was in operation was held to prime the lessor's lien acquired under the new lease.
In Easterling v. Brooks, 28 So.2d 523 (La.App.2d Cir. 1946), plaintiff, on December 1, 1943, leased to defendant twenty acres for two years. Brooks used a truck in the farming operation, and mortgaged it to Walling on March 3, 1944, during the first term of the lease. Although part of the rent under the first lease was not paid, a new (oral) lease was agreed on by plaintiff and defendant. Another lease was made for the main dwelling, which had been excepted from the original lease. The court held that the landlord's privilege arising from the original lease primed the chattel mortgage, but that the privilege of the mortgage primed the landlord's lien arising under the leases made after the recordation of the chattel mortgage.
In McGuffin v. Barkett, 44 So.2d 195 (La.App.2d Cir. 1950), the tenant mortgaged movables during a month-to-month lease. Later the rent was raised, and then reduced. The court held that the continuity of the lease ceased when the rent was changed, and the chattel mortgage primed the subsequently arising lessor's lien.
The jurisprudence is uniform that the lessor's privilege depends on the existence of the lease. There is no landlord-tenant relationship without the lease. As observed by Dr. Dainow above, the earliest time that the lessor's privilege can effect movables is that time when the lease is in effect and the movables are on the premises. The lease in effect when Foreman defaulted was for a term beginning January 1, 1975. The bank's chattel mortgage was recorded October 3, 1974, and therefore primed the lessor's privilege.
For these reasons, the judgment of the Court of Appeal is affirmed, at relator's cost.
CALOGERO, J., dissents for the reasons assigned by the dissenting judge in the Court of Appeal.
NOTES
[1] "Every such mortgage shall be effective as against third persons from the time of the filing in the proper offices, and the filing shall be notice to all parties of the existence of the mortgage, which shall be superior in rank to any privilege or preference arising subsequently thereto."
[2] "But this privilege shall take place against third persons only in case the pledge is proved by some written instrument, in which shall be stated the amount of the debt intended to be secured thereby, and the species and nature of the thing given in pledge; or the description of the thing pledged may be contained in a list or statement annexed to the instrument of pledge and giving its number, weight or descriptive marks.

When a debtor wishes to pledge promissory notes, bills of exchange, bills of lading, stocks, bonds, policies of life insurance, or written obligations of any kind, he shall deliver to the creditor the notes, bills of exchange, bills of lading, stocks, bonds, policies of life insurance, or other written obligations, so pledged, and such pledge so made, except as hereinafter provided with regard to life insurance policies, shall without further formalities be valid as well against third persons as against the pledger thereof, if made in good faith, provided that where the pledge of instruments not negotiable, the debtor must be notified thereof, it being understood that no notification is required in the case of the pledge of certificates of corporation stock. All pledges may be made by private writing of any kind if only the intention to pledge be shown in writing, but all pledges, except of a life insurance policy in favor of the insurer, must be accompanied by actual delivery. The pledge of a life insurance policy must also be evidenced by a written assignment thereof as security to the pledgee and by delivery of the pledge or assignment to the insurer and, unless the beneficiary thereof may be changed upon the sole request of the insured, or unless pledge or assignment without the consent of the beneficiary be specifically provided for in the policy, must be accompanied by the consent of any named beneficiary who is not the insured or his estate; it is further provided that whenever a pledge of any instrument or item of the kind listed in this article is made to secure a particular loan or debt, or to secure advances to be made up to a certain amount, and, if so desired or provided, to secure any other obligations or liabilities of the pledger to the pledgee, then existing or thereafter arising, up to the limit of the pledge, and the pledged instrument or item remains and has remained in the hands of the pledgee, the instrument or item may remain in pledge to the pledgee or, without withdrawal from the hands of the pledgee, be repledged to the pledgee to secure at any time any renewal or renewals of the original loan or any part thereof or any new or additional loans, even though the original loan has been reduced or paid, up to the total limit which it was agreed should be secured by the pledge, and, if so desired or provided, to secure any other obligations or liabilities of the pledger to the pledgee, then existing or thereafter arising, up to the limit of the pledge, without any added notification or other formality, and the pledge shall be valid as well against third persons as against the pledger thereof, if made in good faith; and such renewals, additional loans and advances or other obligations or liabilities shall be secured by the collateral to the same extent as if they came into existence when the instrument or item was originally pledged and the pledge was made to secure them; the delivery of property on deposit in a warehouse cotton press, or on storage with a third person, or represented by a bill of lading, shall pass to the pledgee by the mere delivery of the warehouse receipt, cotton press receipt, bill of lading, or storage receipt, showing the number, quantity or weight of the thing pledged; and such pledge so made, without further formalities, shall be valid as well against third persons as against the pledger thereof, if made in good faith. Such receipts shall be valid and binding in the order of time in which they are issued for the number, quantity, or weight of the things pledged, if there should not be enough to meet all receipts so issued. Nothing herein contained shall be construed to repeal any part of Title 9, Sections 4301 to 4382, both inclusive of the Louisiana Revised Statutes of 1950."
[3] A notation on the mortgage read:

"The note herein given and the mortgage herein granted and executed is for the sole purpose of being used as collateral security by said mortgagor herein and for that reason the note executed may be pledged to secure loans or advances from time to time and upon payment of said indebtedness the said collateral may be returned to the mortgagor without extinguishment of the mortgage herein granted to secure the same and may again, at any time, be reissued by the said mortgagor and be a valid and existing indebtedness of the said mortgagor in favor of the holder or holders of the same as collateral security, either for the debt contracted by the said mortgagor or to secure the indebtedness of another with the same validity and effect as is now given to it."
The collateral mortgage note contained the following notation:
"This Note is to be used for Collateral purposes and may be negotiated and re-negotiated without any further authentic act."
[4] Odom v. Cherokee Homes, Inc., 165 So.2d 855 (La.App. 4th Cir. 1964), differs factually from the case before us; there, the collateral mortgage notes had not "remained in the hands of the pledgee," (C.C. 3158) but had been transferred from the original pledgee to another person or corporation. There is language in the Odom case which might be construed to be contrary to the provisions of C.C. 3158. To the extent that Odom v. Cherokee Homes, Inc., supra, might be in conflict with this opinion, it is overruled.