GUIDRY, Judge.
This suit is one for an accounting between the partners of a dissolved partnership known as Jimmie Thompson Bowling Equipment[2] (JTBE). The former partners are James W. Thompson and Mike S. Grantham.
The record reflects that in September 1975, Thompson and Grantham entered into a verbal business arrangement for the purpose of purchasing bowling equipment from Japan and reselling it throughout the United States. It was agreed between the parties that Thompson would negotiate for and secure the necessary financing to purchase the equipment and Grantham would perform all labor necessary in selling and installing the equipment. In consideration of Thompson securing the necessary funds for the business, he was to receive 10% of the net profits, with the remainder of the profits to be divided equally between Thompson and Grantham. This arrangement endured for approximately six years until such time as Grantham requested the dissolution of the partnership. Thompson presumably consented to the dissolution of the partnership. This suit followed when the parties could not amicably agree on an accounting and disbursement of the assets of the partnership.
This suit was originally filed as a declaratory judgment suit by Thompson, who *417 sought to be declared the owner of two promissory notes allegedly arising out of JTBE transactions. Grantham answered the suit and reconvened for an accounting of the partnership. Thompson thereafter amended his original pleadings and asked that, if the court should find that a partnership had existed between the parties, Grantham be cast for one-half of all losses that the partnership had suffered and which Thompson had paid.
Shortly following institution of suit, Grantham retained the services of Elmer V. Moore, a certified public accountant, to examine the partnership’s records and furnish him with a report reflecting the assets, receivables and debts of JTBE for the period of September 1975 through March 1982. Pursuant to a Motion to Produce by Grantham, Moore was supplied with the receipts and disbursements journals of JTBE as well as copies of JTBE’s checking account statements and loan ledgers from Rapides Bank and Trust Company of Alexandria. After a serious attempt to reconstruct JTBE’s financial picture, Moore found the journals to be incomplete and erroneous in various aspects, and thus was unable to arrive at an accurate conclusion as to the financial condition of the partnership.
Subsequently, both Grantham and Thompson, through their attorneys, negotiated with Peter M. Staples, a certified public accountant, to reconstruct, as best he could, the financial condition of the partnership over its existence for the purpose of compiling a report reflecting the revenues collected and expenses paid by JTBE.[3]
Trial of the matter commenced on October 18, 1983, and continued for five days, during which voluminous exhibits were presented to the court and entered into evidence. There were a great number of disputes between Thompson and Grantham concerning the ownership of certain assets, the liability of each for certain debts, withholding of partnership funds and the improper use of partnership funds. The trial court for the most part accepted the reports of Staples as being indicative of the financial standing of JTBE and based its judgment thereon.
On November 16, 1984, the trial judge rendered judgment in the present case finding:
(1) A partnership existed between the parties;
(2) Thompson is entitled to receive 55% of the net profits of JTBE and Grantham is entitled to receive 45% of the net profits;
(3) JTBE received $35,865 in excess of revenue over expenses during its existence;
(4) Neither JTBE nor Grantham owe any rent to Thompson for the rental of a warehouse;
(5) Accounts receivable of JTBE consist of:
(a) A note in the principal amount of $270,000 executed by A-C Group, Inc.;
(b) A note in the principal amount of $50,000 executed by Thomas Dietzler, Antoinette Dietzler, Wilson Baker and Barbara Baker;
(c) Proceeds from the sale of Spanish Trail Lanes, Inc.; and,
(d) Monies in the Registry of the Court totaling $213,285.68.
(6) There are no accounts payable by JTBE;
(7) Thompson is to return to the Registry of the Court $1,995 representing the value of an El Camino which he sold;
(8) Grantham is to return to the Registry of the Court $52,500 which represents commissions received by him;
(9) Grantham is to return to the Registry of the Court $24,967 which represents monies received by him from the sale of Spanish Trail Lanes, Inc.; and,
*418 (10) The costs are to be divided equally between the parties.
Based upon the stipulations entered into between the parties, the evidence adduced at trial and the reports submitted by Staples, the trial court found the breakdown of expenses and revenues of JTBE to be as follows:
Revenues Collected:
Stipulated Total. $4,175,368.00
Cost of Sales:
Equipment and Merchandise. $1,455,055.00
Capital and Fixed Assets_ 653,092.00
Total Cost of Goods Sold. $2,108,147.00
Gross Profits . $2,067,221.00
Expenses Paid:
Salaries . $119,076.00
Customs Duty . 89,157.65
Freight. 308,325.00
Extra Help . 32.167.30
Gas and Oil. 65,370.20
Utilities . 6,533.54
Telephone . 19.603.30
Travel. 123,497.40
Supplies. 27,142.62
Repairs & Maintenance. 70,726.37
Advertising. 2,804.35
Advising Fees. 658.33
Interest . 341,431.00
Insurance . 73,888.00
Installation. 508,847.00
Commission. 130,526.25
Legal . 8,867.01
Miscellaneous. 9,883.18
Taxes and License. 56,424.69
Petty Cash. $ 27,740.00
Bank Charges. 845.54
Rent. 600.00
Unexercised option. 1,000.00
Payroll taxes. 6,041.00
Employee advance uncollect 200.00
Total Expenses Paid. $2,031,355.40
Excess of Revenue over Expenses. $ 35,865.60
Both parties have appealed and assign errors allegedly committed by the trial court. We will first discuss Thompson’s assigned errors and thereafter the errors assigned by Grantham.[4]
In his first assignment of error, Thompson asserts that the trial court erred in failing to list as an expense of the partnership the sum of $382,666.66, which he alleges was due to him personally for the rental of a warehouse by JTBE.
In his written reasons for judgment, the trial judge discussed his reasons for denying Thompson’s claim for warehouse rentals as follows:
“Mr. Thompson testified that he had leased a warehouse from his children and had used the building to store property of the bowling business. There was also testimony that a small portion of the warehouse was used to store personal items of Mr. Thompson. For approximately six years there was apparently no mention made of what the rental would be, how much space would be rented, nor was there ever any bookkeeping entries made concerning this item. Whether or not Mr. Thompson expected the bowling business to pay him rent on a warehouse he supposedly leased from his four children is such speculation that the Court cannot possibly determine whether such an agreement was even discussed and if so what rental was to be paid. The evidence and testimony at the trial of this case is simply not sufficient for this Court to hold that the business is indebted to Mr. Thompson for the rental of the warehouse. The party attempting to prove a debt must do so by some minimal reliable evidence. In this case Mr. Thompson has failed to show that there was an agreement to rent, there was no evidence to indicate how long the lease was to last, the price, or the amount of space to be occuppied [sic].”
We agree with the trial judge that no lease agreement was ever entered into by Thompson and JTBE. Although the record reflects that part of the warehouse in question was used to store JTBE equipment, there is no evidence of a mutual agreement as to the essentials necessary for the confection of a valid lease. Both parties to this suit admitted at trial that they had never agreed upon a specific rent *419 al price, although they had discussed the prospect of ascertaining comparable prices for the rental of similar warehouses in the area. No such price was ever arrived at or agreed upon.
It is well settled that the three requisite elements to a contract of lease are the thing, the price and the consent. La. C.C. art. 2670; Acadiana Bank v. Foreman, 352 So.2d 674 (La.1977); Piper v. Central Louisiana Electric Company, Inc., 446 So.2d 939 (La.App. 3rd Cir.1984). Our review of the record fails to disclose the requisite element of consent or any agreement between the parties as to a price for the lease of the warehouse. Without consent and a certain and determinate price, there can be no contract of lease. La.C.C. art. 2671; Mouton v. P.A.B., Inc., 450 So.2d 410 (La.App. 3rd Cir.1984), writ denied, 458 So.2d 118 (La.1984). We therefore find no error in the trial court’s denial of Thompson’s demand for rent.[5]
In his next assignment of error, Thompson contends that Grantham should return to the partnership the sum of $105,000 which he, Grantham, received over the life of the partnership as a commission or draw. Thompson argues that this sum should be returned to the partnership because there was no agreement between the parties for the payment of commissions to Grantham.
The record substantiates the fact that Grantham received the sum of $105,000 in commissions or draws out of the $130,-526.25 listed as commissions under Expenses Paid by JTBE in the Staples report. At trial, Grantham testified that he used this money to pay for certain living expenses which he incurred while traveling around the country, trying to secure purchasers for JTBE’s bowling equipment. Grantham testified that it was agreed upon by he and Thompson at the outset that he would make periodic draws from JTBE’s account to pay for such things as his motel rooms, air and cab fares, food and occasional entertainment expenses. Grantham listed this money as income on his individual tax returns, initially as a draw and later as a commission. Grantham claims, however, that the money he withdrew was not a commission but simply payment for his living expenses. He also testified that some of his travel expenses were paid out of JTBE’s petty cash. We note the sum of $123,497.40 as stipulated between the parties to represent the amount of travel expenses paid by JTBE. However, the record does not make clear whether this figure includes travel expenses incurred by Grant-ham.
The trial court presumably found that Grantham was not entitled to the $105,000 in commissions in that it ordered him to return to the Registry of the Court the sum of $52,500 representing commissions received by him. We find sufficient evidence in the record to support the trial court’s determination that Grantham was not entitled to receive a commission from JTBE but only 45% of the net profits of JTBE, as per the initial arrangement between the parties. We therefore affirm the trial court’s conclusion in this regard. However, the trial court erred in requiring Grantham to return to the Registry of the Court only one-half ($52,500) of the amount which he actually received in commissions. The trial court should have ordered Grant-ham to return the full sum of $105,000 to the Registry of the Court and then to allocate 55% of that amount to Thompson and 45% to Grantham. We will therefore amend the trial court’s judgment to so provide.
In his next assignment of error Thompson urges that Grantham should return to the Registry of the Court the sum of $126,-431.67,[6] which is money allegedly due to *420 JTBE but which Grantham collected and retained for his personal use. Thompson contends that Grantham received the sum of $126,436.67 in part from the sale of the Spanish Trail Lanes, Inc., in Arizona (Grantham allegedly received a profit on this transaction of $24,956.67); in part from a promissory note executed by the A-C Group, Inc. (from which Grantham allegedly received $94,837.12); and, in part from a promissory note executed by the Dietzler group (from which Grantham allegedly received $6,642.88). Grantham readily admitted at trial that he received the above amounts and diverted them to his own personal use instead of transferring them to JTBE’s account.
We find no merit to this assignment of error in that the trial court’s judgment correctly disposes of the very issues raised by Thompson. We note that by interlocutory judgment dated February 3, 1983, Grantham was ordered to deposit into the Registry of the Court all funds which he had previously collected from the A-C Group, Inc. and the Dietzler group as well as all future collections from the A-C Group, Inc., the Dietzler group and all other persons, partnerships, firms and associations as a result of JTBE’s business endeavors. Grantham was further ordered to deposit into the registry of the court all proceeds from the sale of the assets of Spanish Trail Lanes, Inc., including funds on deposit by Grantham in Security First National Bank in Alexandria. It was also ordered that the fund held in escrow in Phoenix, Arizona, which was generated by the sale of assets from the bankruptcy of Spanish Trail Lanes, Inc. was to be transmitted to the Registry of the Court. The record indicates that as of October 7, 1983, $75,122.87 had been deposited into the Registry of the Court from Valley National Bank in Arizona and $42,149.92 from the A-C Group, Inc. We note from the record that, at the time of trial, the sum of $213,-285.68 was in the Registry of the Court. We assume, since no mention is made of this amount by the trial court or on the ledger from the Registry of the Court, that the amount in the Registry of the Court includes those amounts received by Grant-ham as aforestated and which he was ordered to deposit into the Registry of the Court. The trial court, in its judgment of November 16, 1984, determined that the assets of the partnership consisted of the A-C Group, Inc. note of $270,000, the Dietzler group note of $50,000 and the proceeds from the sale of Spanish Trail Lanes, Inc. Thompson’s complaint is therefore satisfied by the trial court judgment wherein it recognized the above assets as belonging to the parties and further ordered Grantham to return to the Registry of the Court $24,967 which Grantham acknowledged receiving and which he apparently had not deposited into the Registry of the Court. We therefore find this assignment of error by Thompson to be without merit.
Finally, Thompson argues that the trial court erred in failing to take into consideration the amount of interest he would have earned on money that he advanced to the bowling equipment business during its existence. This argument is based on the premise that JTBE allegedly agreed to pay Thompson 2% above the prime interest rate on personal funds advanced by Thompson and on monies borrowed by Thompson for JTBE. The trial court rejected Thompson’s demands in this regard concluding that Thompson had not proven the existence of any such agreement.
We agree with the trial court that the record does not support the existence of any agreement between the parties for the payment of 2% plus prime on monies advanced by Thompson to JTBE or on monies borrowed for JTBE. The record does indicate that the parties initially agreed that in exchange for Thompson securing the necessary operating funds for JTBE he would receive 10% of the net profits. The remaining profits would thereafter be di *421 vided equally between the parties. There was never any agreement between the parties that Thompson would supply any of his personal funds to JTBE. Thompson was simply to use his line of credit already established at Rapides Bank and Trust Company in Alexandria to secure loans for JTBE. Any funds loaned to JTBE from Thompson’s personal accounts or other Thompson businesses were made without Grantham’s express knowledge or assent. We therefore find no error in the trial court’s refusal to award Thompson interest on any sums personally loaned to JTBE or on funds borrowed for JTBE.[7]
We now move to a consideration of Grantham’s assignments of error. In his appellate brief, Grantham sets forth 23 specifications of error. Most of these are leveled at the accuracy and/or correctness of the financial reports submitted by Staples and specifically with regard to the treatment which he afforded certain isolated transactions between JTBE and others during the nearly six years of the partnership’s existence. The trial court accepted Staples’ reports, which were compiled after some 500 to 600 hours of work over a period of four to five months, with few exceptions.
We have carefully examined the record in this case and find no error in the trial court’s acceptance of these reports as correctly setting forth the revenues and expenditures of the partnership. For that reason, we will not discuss with specificity those assignments of error which question the treatment afforded certain isolated transactions by Staples. We will therefore discuss only those assignments which do not deal with the aforesaid or which we find to be meritorious.
Grantham’s first assignment of error which we address on appeal deals with the testimony of Staples at trial. Grantham argues that the trial court erred in allowing Staples to testify from particular records utilized in compiling his reports of JTBE’s financial condition. Grantham claims that these records were not properly produced under his various motions to produce and thus were not supplied to his own accountant, Moore. Grantham also urges that he was not allowed an opportunity to cross-examine Staples as to the documents used in compiling his reports.
During the discovery phase of this case, Grantham filed two motions to produce, seeking “any and all documents, books, records, journals, cancelled checks, bank statements, promissory notes or other documentation which reflect or purport to reflect the business transaction” of JTBE. Thompson thereafter supplied Grantham and Moore with records of JTBE’s checking account with Rapides Bank and Trust Company of Alexandria, cancelled checks for that account, receipts and disbursements journals captioned “Jimmy Thompson Bowling Equipment”, copies of annual summaries of the disbursements of JTBE, two typewritten statements captioned “Jimmy Thompson Bowling Equipment”, and copies of the loan ledgers from Rapides Bank and Trust Company in the name of Jimmie Thompson. From these records, Moore attempted to reconstruct a financial summary of JTBE, but was unsuccessful. Subsequently, Staples was retained to prepare a report summarizing JTBE’s revenues and expenses over the life of the partnership.
As stated earlier, the trial court found that both parties agreed to retain Staples to examine all of the records in Thompson’s possession in order to reconstruct, as best he could, the financial situation of JTBE. According to Staples, he examined voluminous records consuming from 500 to 600 hours over a period of nearly five months. Staples’ examination of JTBE’s financial condition was not confined solely to JTBE’s books. Because there was a great deal of commingling of monies from Thompson’s various businesses, it was necessary for *422 Staples to consider the records of all of Thompson’s business ventures.
At trial, Grantham objected to the introduction of Staples’ reports and findings on the ground that Staples was afforded more information with which to compile his report than was Moore. The trial court overruled the objection, holding that Grant-ham’s motions to produce were waived at the meeting wherein Staples was engaged by both Thompson and Grantham to compile a report based on all of Thompson’s records. We find no error in such determination. Grantham cannot now complain that Moore was not supplied with sufficient records.
We also find no merit in Grantham’s argument that he was not afforded an opportunity to properly cross-examine Staples. On the contrary, the record reveals that the trial judge was extremely liberal in allowing Grantham’s attorney the opportunity to cross-examine Staples regarding various transactions reflected in his reports. At trial, when Staples could not answer certain specific questions posed by Grantham’s attorney regarding his treatment of numerous specific items, the trial court allowed Staples the opportunity to leave the stand and go through his work papers in order to determine exactly how he handled the transactions which he was being questioned about. When he returned to the stand, Grantham’s attorney proceeded to reiterate those questions previously posed. However, when Grantham’s attorney asked him yet another question not referred to previously, and Staples was unable to answer it without again referring to his work papers, the trial judge refused him leave to do so again. The trial judge reasoned that Grantham’s attorney was given ample opportunity to have Staples look up that particular answer when he was first allowed to go back into his work papers and that he could not continue interrupting the proceedings with every question posed.
Considering the great amount of latitude initially given Grantham’s attorney in questioning Staples regarding various isolated transactions contained in his reports, we find no error on the part of the trial judge in finally limiting those questions posed to Staples and upon which he was allowed time to refer back to his work papers for answers. A trial judge has the right to control the nature, extent and character of cross-examination in the interest of judicial economy so long as it does not effectively deprive a litigant of the procedural right to cross-examination. La.C.C.P. art. 1631; Labadot v. Labadot, 328 So.2d 747 (La.App. 4th Cir.1976), on appeal after remand, 347 So.2d 319 (La.App. 4th Cir.1977). The record reveals no abuse of discretion by the trial judge nor do we find that Grantham was deprived of his procedural right of cross-examination. He was given ample opportunity to have Staples go back through his work papers to answer specific questions and could not expect the trial judge to halt the trial proceedings every time he thought of a new and different financial item to ask Staples to elaborate upon.
In his next assignment of error, Grant-ham complains that the trial court erred in failing to declare as an asset of the partnership twenty-four lanes of bowling equipment which he alleges was purchased with partnership funds for use by Thompson in an unrelated business.
Aside from being a partner in JTBE, Thompson operated several unrelated businesses under the name “Jimmie Thompson Enterprises” (JTE). One such concern was a bowling alley in Alexandria known as Bowlero Bowling Lanes (Bowle-ro). Thompson admitted at trial that he did purchase 24 lanes of bowling equipment through JTBE for the purpose of enlarging Bowlero, but testified that he paid for this equipment with his personal funds. Although Grantham alleges that Thompson never paid for this equipment, he did not present any evidence at trial to substantiate his allegations. We therefore find no error in the trial court’s refusal to declare this equipment an asset of the partnership. Grantham simply failed to meet his burden of proof as to this item.
*423 Grantham next argues that the trial court erred in ordering him to return to the Registry of the Court the sum of $52,500 representing commissions received by him. As we stated in our earlier discussion, we find no error in the trial court’s ruling except as to the amount it required Grant-ham to return to the Registry of the Court. Instead of ordering Grantham to return $52,500 (half of the commissions he earned) to the court, he should have more properly been ordered to return the full amount of $105,000 for the court to later divide between Thompson and Grantham 55-45, respectively.
The next assignment of error which we discuss involves transactions between JTBE and TEG Bowling Corporation (TEG). TEG was a corporation formed by Thompson, Jack Eckles and Grantham in 1978 for the purpose of opening and operating a bowling alley known as TEG Bowling Center (Center) in Albany, Georgia. Thompson and his four children bought a building in Albany, Georgia in which TEG was to operate a bowling alley. Eckles owned 25% of TEG, Grantham 3% and Thompson’s children the remaining 72%. JTBE installed in the Center 48 lanes of bowling equipment stipulated at trial to be worth $288,000. No note or other security was ever given JTBE in exchange for the equipment, nor was a price ever decided upon for the “sale” of this equipment. Eckles subsequently acquired sole ownership of TEG. Eckles eventually sold TEG to Diversified Bowling which allegedly went bankrupt.
On appeal, Grantham urges error in the trial court’s failure to order the return of a $288,000 note held by Thompson and his children to the partnership. At the outset, we find that the record makes clear that there does not exist a note for $288,000 executed by TEG to JTBE. Nor was any payment on the equipment and installation ever made by TEG. However, Grantham contends that when TEG and the Center were sold to Eckles, Thompson and his children received a promissory note in the amount of $1,162,336. Grantham sets forth in brief that, “[i]nasmuch as the bowling equipment was sold by Mr. Thompson to one of his own corporations (TEG), for which he in turn used for 4 years before eventually selling to another party (Eckles), he should be made to return to the partnership the sum of $288,000.00.”
We agree with Grantham that the sum of $288,000 is owed to JTBE for the sale and installation of 48 lanes of bowling equipment in the Center. We also agree that this sum is owed to JTBE by Thompson. The record reveals that the 48 lanes of bowling equipment was included in the transaction whereby Eckles acquired TEG and the Center from Thompson and his four children. Thompson admitted that the consideration for the bowling equipment was included in the $1,162,336 note from Eckles. In this regard, Thompson’s testimony regarding the Eckles note and the deed for the Center in Georgia transpired as follows:
“Q You recognize that deed, do you not sir?
A I think so.
Q And that was the sale of the entire bowling operation?
A I don’t know.
Q What monies were received for the sale of that bowling operation?
A I don’t think any.
Q Was any ... were there any notes given?
A I’m sure.'
Q And would that have been the note in the amount of one million, one hundred sixty-two thousand, three hundred and thirty-six dollars?
A I feel sure.
[[Image here]]
Q ... The note in excess of one million dollars, that was the note that was given for the payment of the entire Georgia operation, was it not?
A I guess so.”
Thompson’s evasiveness as to the sale of TEG to Eckles continued as follows:
“Q Well, sir, you executed the sale, did you not?
*424 A ... I'm ... under this ... this question that you asked me, as I understand it, and these papers, is your [sic] asking me did I sell the bowling equipment that Mike Grantham and I had in the bowling business. And I may or I may not have, but it really doesn’t make any difference because the money is owed, and if it’s owed I will accrue it to Mike Grantham, just as Mike Grantham has sold millions of dollars worth of stuff all over the country. If I did that then it will accrue to it, and I have no objections to it accruing to the ... to the ... ah ... ah ... business of the Bowling Equipment. I think that’s what you’re asking me, and that’s my answer.”
When pressed further about whether the bowling equipment was included in the sale to Eckles, Thompson testified:
“Q Don’t those proceeds represent payment for Jimmie Thompson Bowling Equipment Enterprise?
A I don’t know at this time. I just told you, if they represented it and if they belong to Jimmie Thompson Bowling Equipment. Why should I have to put up the money that Mike hasn’t put up?
Q Sir, was the bowling equipment in this sale?
A Yes sir.
Q And have you collected monies on that note?
A I feel sure I have.
[[Image here]]
Q ... Didn’t you, in 1982, on January 28th, 1982, sell or assign the forty-eight lanes to the T.E.G. Corporation at the same time of the ... of the deed (Interrupted)
A And I answered (Interrupted)
Q To T.E.G. Corporation?
A I answered you that I possibly did, and if I did, all the money accrues to the Jimmie Thompson-Grantham, or whatever, Bowling Enterprise.
Q I just want ... I just want to know if you sold them, Mr. Thompson. That’s all. (Interrupted)
A Well I don’t know. I probably did.
[[Image here]]
Q No sir, I just want to know if ... if you made that transaction. If you made a sale of the forty-eight alleys to the T.E.G. Corporation (Interrupted)
A It appears to me yes.
Q All right, sir. Did you then at that time get a promissory note?
A Yes sir.
Q For the alleys and for the land and the building, et cetera?
A Yes sir.”
Although Thompson’s answers were initially evasive, his testimony conclusively indicates that the 48 lanes of bowling equipment were included in the sale from Thompson and his four children to Eckles for which a $1,162,386 note was given by Eckles. Additionally, there is no evidence in the record indicating that Thompson ever reimbursed or paid JTBE for the stipulated value of the lanes, i.e., $288,000. Under these circumstances, we conclude that the trial court erred in failing to order a return of these monies by Thompson to JTBE.
With regards to TEG, Grantham also claims that Thompson should have been required to return to the partnership the sum of $175,000 which allegedly represents profits made by TEG and received by Thompson. Grantham argues that “[sjince Mr. Thompson has used the bowling equipment business for he and his children’s own personal profit, he should have to return this amount to the partnership”. We find no merit to this argument. JTBE cannot claim profits made by Thompson and his children from TEG, a totally separate and independent enterprise, simply because TEG failed to pay its debt owed to JTBE.
Next, Grantham argues that Thompson should have been required to return to JTBE the sum of $52,000, which represents partnership funds used to purchase pinball machines for TEG. The record indicates that TEG purchased approximately $89,000 worth of pinball machines from Taito America Corporation. *425 TEG gave Taito a promissory note for $52,-000 and paid the difference. When Thompson realized that TEG was paying 15% interest on the note, Thompson wrote a check on JTE’s account for $52,000 and paid off the note to Taito. Thompson then personally withdrew $52,000 from JTBE’s account and deposited same in JTE’s account. There is no indication in the record that Thompson or TEG ever reimbursed JTBE for this amount. We find that since Thompson personally withdrew the aforesaid amount from JTBE, he is required to reimburse same. The trial court erred in holding to the contrary. We will therefore amend the trial court’s judgment to so provide.
In line with the above, Grantham also urges error in the trial court’s failure to require Thompson to return the sum of $1,500 to JTBE which was allegedly withdrawn by Thompson from JTBE’s account to purchase amusement park equipment from Westview Park Corporation for use in a separate business owned by Thompson. Staples testified at trial that TEG wrote a check to Westview Park in the sum of $1,500 and was later reimbursed by Thompson for that amount from JTBE’s account. Staples treated this check as well as all other payments from JTBE to TEG as an investment in TEG. The trial judge disallowed these entries in the final accounting of JTBE on the premise that TEG was a separate entity from JTBE. We agree that TEG is a separate entity, however, since Thompson personally withdrew these funds, we determine that Thompson should reimburse JTBE.
In his next assignment of error, Grant-ham argues that Thompson breached the fiduciary duty owed by him to JTBE by selling the remaining assets of the partnership for the sum of $775,000 when Grant-ham had previously obtained a sale for these assets for the sum of $1.26 million dollars.
In the early part of 1981, Grantham informed Thompson that he wanted to dissolve the partnership. The parties thereafter sought a purchaser for the remaining assets of JTBE. Grantham claims that he wanted to sell the equipment piece by piece in order to obtain a greater price but Thompson insisted they sell it as a whole in order to obtain a capital gain for income tax purposes. Although the testimony indicates that Grantham had arranged for the sale of the assets of JTBE with a group from Texas for over $1 million, the negotiations fell through. Grantham was thereafter unable to secure a similar price for the sale and Thompson sold the remaining assets of the business at the highest price he could obtain, i.e., $775,000.
Grantham argues in brief that had Thompson allowed him to sell the remaining bowling lanes individually rather than in globo, he could have sold the business for a much greater profit than Thompson secured. He claims that Thompson insisted, however, that the assets be sold in globo in order that he might receive a tax advantage. Irrespective of Thompson’s motivation, we find no evidence in the record to substantiate Grantham’s contention that he could have sold the assets for a greater price if he could have sold them individually. We therefore find no error in the trial court’s ruling that Thompson did not breach his fiduciary duty in this regard. There is no evidence in the record to indicate that Grantham actually could have received a higher price for the equipment than that obtained by Thompson.
Grantham next complains that the trial court erred in failing to require Thompson to return the sum of $200,000 to JTBE, being JTBE funds allegedly used by Thompson to purchase bowling equipment in Arkansas. The record indicates that Thompson did purchase $200,000 worth of bowling equipment from Eckles which was located in Arkansas. At trial, Thompson testified that this sale had nothing to do with JTBE and that he paid for this equipment out of his own personal funds. Although Grantham conceded at trial that this equipment was unrelated to JTBE, he contends that JTBE paid for it. He bases this argument on the ground that there exists a check from JTBE to Thompson in *426 the amount of $200,000, written at the same time that the equipment was purchased in Arkansas.
We find no error in the trial court’s handling of this issue. Grantham’s mere allegation that this equipment was purchased with JTBE’s funds, and the existence of a $200,000 check from JTBE to Thompson, is not sufficient evidence. Considering the large volume of money going in and out of JTBE’s account at that time, it is impossible to say that this $200,000 went for the payment of bowling equipment purchased for Thompson’s other businesses.
The next assignment of error by Grantham is that the trial court erred in failing to make Thompson return to the court the sum of $85,865, the amount found by the trial court to be the profits realized by JTBE. As set forth in his written reasons for judgment, the trial judge found the total revenues in excess of expenses over the life of the partnership to be $35,-865.60.[8] He arrived at this figure by utilizing the various stipulated figures in addition to the figures supplied by Staples. Grantham now contends on appeal that Thompson should be required to return this amount to the partnership since it was Thompson who disposed of the remaining assets of the partnership, including money in the bank. We find no merit to this argument. Prior to Thompson’s sale of the partnership assets, there existed a large debt still owing Rapides Bank and Trust Company. Thompson apparently used the proceeds of the sale in order to extinguish the debt at the bank, since it was found by the trial court that JTBE had no accounts payable at the time of trial. The $35,865 is thus necessarily contained in the accounts receivables found by the trial court to be the promissory notes from the A-C Group, Inc. and the Dietzler group as well as the proceeds from the sale of Spanish Trail Lanes, Inc. Thompson is therefore not indebted to JTBE for the sum of $35,865 as this sum is already included in the assets of JTBE which are in the Registry of the Court.
The next assignment of error deals with two 20 foot high bowling pins used for advertisement purposes. The evidence is undisputed that these bowling pins were given to JTBE as gifts by Mr. Ichinose of Japan. The only costs incurred by JTBE on the pins were those for freight and the expenses of moving them to their intended destinations. Grantham contends that, since Thompson has kept the pins and is using them for advertising purposes, he should reimburse JTBE for the freight and moving expenses paid by JTBE on the pins.
At trial, Thompson testified that he had no idea what the freight charges were on the two giant bowling pins. Grantham estimated, at trial, that the freight charges were $4,500 per pin. On appeal, Grantham seeks $1,500 per pin. No receipts for the actual freight charges on the pins were offered in evidence. Since we can find no indication in the record of what amount of freight was actually paid by JTBE on the bowling pins, we find that Grantham has failed to prove this item. The trial court was correct in disallowing same.
In his final assignment of error, Grantham urges that Thompson should have been required to return to JTBE the sum of $44,000, which represents the cost of a Peterbilt truck owned by the partnership. At trial, Thompson testified that he sold the truck along with the remaining assets of the partnership to a group of Australians for the total price of $775,000, although the truck remained in his possession and the title in his name. Thompson claims that he later bought the truck back from the Australians for about $40,000. Grantham alleges that the truck was never sold to the Australians and therefore, Thompson should reimburse JTBE for the original price of the truck, i.e., $44,000. *427 The trial court apparently attached more credibility to Thompson’s testimony than to Grantham’s and disallowed Grantham’s request. We do not find that he abused his discretion in deciding the credibility of the testimony received and thus find this assignment of error to be without merit.
DECREE
For the above and foregoing reasons, we amend the trial court judgment in the following respects: (1) that Grantham should return to the Registry of the Court the sum of $105,000 representing commissions which he received over the life of the partnership, as opposed to the trial court judgment ordering the return of only $52,500; (2) that Thompson should return to the Registry of the Court the sum of $288,000, representing monies owed to JTBE for the sale of 48 lanes of bowling equipment for which Thompson was paid by a promissory note from Jack Eckles; (3) that Thompson should return to the Registry of the Court the sum of $52,000 which represents payments by JTBE on pinball machines used by TEG; and, (4) that Thompson should return to the Registry of the Court the sum of $1,500, representing monies paid by JTBE for the purchase of amusement park equipment for Thompson’s separate businesses. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are to be shared equally between the parties.
AFFIRMED AS AMENDED.

. The partnership was referred to several times in the record as Thompson and Grantham Bowling Equipment, but we note that all of the financial records of the business were kept in the name of Jimmie Thompson Bowling Equipment. We will therefore refer to it as such.

. At trial, Grantham's attorney denied that Staples was jointly retained by the parties to render an accounting of JTBE’s financial dealings. However, the trial judge found, based upon the testimony of Staples and Thompson’s attorney, Donald Sharp, that Staples was in fact approached by both parties to serve as an impartial witness in rendering a report on the financial condition of JTBE. We find no clear error in this fact determination.

. Prior to the appeal, Mike S. Grantham died. On October 23, 1984, Dennis Clyde Botts, as administrator of the Succession of Grantham, was substituted as party defendant. Botts thereafter perfected a devolutive appeal on January 15, 1985.

. The trial court’s conclusion in this regard, which we affirm, is further supported by the fact that Thompson's children, not Thompson, are shown by the record to be owners of the warehouse building.

. Thompson claims that the sum of $126,431.67 should be returned to the Registry of the Court. He explains in brief that this figure is the sum of three different amounts owed to JTBE, i.e., $24,956.67, $94,837.12 and $6,642.88. Upon adding these figures together, we find that the *420 actual amount claimed by Thompson to be returned to the Registry of the Court is $126,-436.67.

. Staples’ report makes clear that JTBE paid all interest which was generated on loans made to or on behalf of JTBE.

. Although $35,865.60 was the amount of revenues over expenses as set forth in the reasons for judgment, the trial court apparently rounded off this figure in his judgment dated November 16, 1984 to $35,865.00.