FRED W. JONES, Jr., Judge.
Plaintiff, G.R.W. Engineers, Inc., appealed a judgment of the trial court in favor of Winnsboro State Bank and Trust Company (hereinafter referred to as WSB) finding that plaintiffs architectural and engineering lien was ranked inferior to the collateral mortgages held by the mortgage creditor, WSB, in plaintiff's action to rank liens and mortgages. For the reasons stated herein, we affirm the judgment of the trial court.
On appeal, plaintiff asserts the following assignments of error:
1) The trial court erred in ranking plaintiffs architectural and engineering lien from the date of its filing on December 23, 1981 rather than from September 10, 1981, the date construction and renovations began on the jobsite; and,
2) The trial court erred in holding that the payment by WSB to Sicily Island State Bank on August 31, 1982 in the amount of $142,128.26 constituted a payment with subrogation, thus entitling WSB to retroactive ranking.

Factual Context

The record shows that the various transactions giving rise to this suit were the result of the construction and renovation of a building into a restaurant, the Jackson House Restaurant, in Winnsboro. Plaintiff has been before this court on a previous occasion on a related matter arising out of the construction and renovation of the restaurant. See GRW Engineers, Inc. v. Elam, 504 So.2d 117 (La.App. 2d Cir.1987), writ denied, 506 So.2d 1230 (La.1987).
In July 1980, Phillip Killian and George Elam, Jr. met with plaintiff to discuss the proposed renovations and construction of the Jackson House Restaurant. Plaintiff agreed to perform architectural and engineering work on the proposed project. Elam and Killian formed a corporation, Chateau Royale, Inc., later known as Adairs, Inc., for the purpose of acquiring a historic building and converting it into the restaurant. On September 10, 1981 construction work commenced on the renovation project. On September 25, 1981, Killi-an and Elam executed a collateral note secured by a mortgage on the property in the amount of $110,000, which was pledged to Sicily Island State Bank (hereinafter referred to as SISB). On December 14, 1981, Elam and Killian executed a collateral note and mortgage in the amount of $50,000 which was also pledged to SISB. On December 23, 1981 plaintiff filed an architectural and engineering lien on the property. The construction of the restaurant was completed in January 1982.
On August 18, 1982 Jackson House, Inc., Killian and Elam executed a collateral note and mortgage in the amount of $200,000 and a collateral chattel mortgage in the same amount. On the same date, a collateral pledge agreement was executed by Jackson House, Inc., Killian and Elam whereby the $200,000 collateral mortgage note and the $200,000 collateral chattel mortgage note were pledged to WSB. In addition, the $110,000 collateral note dated September 25, 1981 and the $50,000 collateral real estate mortgage dated December 14, 1981 were pledged to WSB in the same collateral pledge agreement. On August 31, 1982, WSB issued a check to SISB for $142,128.26 in return for the two collateral notes and mortgages.
On July 28, 1983 WSB filed a petition for ordinary process and writ of sequestration naming as defendants, Jackson House Inc., Killian and Elam, seeking a money judgment for $197,619.27 arid the recognition of the various mortgages held by it on both movable and immovable property. The *727 record in that suit indicates that no further action has been taken by WSB since the filing of its petition. Plaintiff obtained a judgment in April 1986 recognizing its architectural and engineering lien and granting a money judgment for architectural and engineering services rendered on the project.
On December 13, 1988 plaintiff filed this rule to establish the ranking of liens and mortgages. Plaintiff alleged that WSB was the holder of three collateral mortgage notes affecting the property and, in anticipation of a sheriff’s sale, it was necessary that the court determine the ranking as between plaintiffs lien and the mortgage creditor, WSB.
At the hearing on the rule, Mark Bord-leon, the former executive vice-president of SISB, testified that on September 25, 1981 the collateral mortgage note for $110,000 payable to any future holder was used as a negotiable instrument in order to lend money to Killian and Elam for the purpose of remodeling the Jackson House. The note was pledged to SISB on September 28, 1981 and the first loan was made by the bank for the renovations. The total amount of funds advanced by it on this particular note was $64,000. Bordleon said that he noticed Elam had gone over the amount of the original collateral mortgage and was instructed that the bank needed more collateral on the same property to raise the amount of the mortgage. Therefore, another collateral mortgage note was prepared for an additional amount. Bord-leon stated that on December 15, 1981 Elam brought another note to SISB to use as security for further construction and remodeling on the restaurant. The note and the mortgage were for $50,000, and $25,000 was advanced by the bank on that note. Bordleon asserted that Elam requested further advances by the bank but the bank would not go any higher on the property as it had approximately $140,000 invested at that time. Elam then negotiated with WSB for further financing. Bord-leon said he believed the bank transferred the two collateral mortgage notes to WSB and it sent SISB the payoff for the collateral mortgages. Bordleon stated that the intent of SISB was to sell the position that it held in the property to WSB, which would include the ranking of the mortgages. However, there was no written agreement to that effect.
John Hampton, president of WSB, testified that his bank paid SISB $142,128.26 for the notes. He said the intent of WSB in paying off the mortgages was that it would be subrogated and retain a first mortgage on the building by buying SISB’s position. Hampton stated that Killian and Elam had already made arrangements for a loan before the bank bought SISB’s mortgages. However, the bank had not advanced any money until SISB was paid off. Hampton testified that it was customary to transfer collateral mortgages from one bank to another and the bank’s intent was to buy the collateral mortgages and notes. Hampton said that Killian and Elam pledged the note on August 18, 1982 but the bank did not disburse any funds until it received the two notes from SISB.
After examining the evidence, the trial court concluded that WSB’s purchase of SISB’s collateral mortgages on August 31, 1982 related back to the date of recordation of the collateral mortgages, September 28, 1981 and December 15,1981. The lien filed by plaintiff on December 23, 1981 was subsequent to the filing of the collateral mortgages and would thereby be primed by them. The court held that the retroactivity of the ranking was only for the amount paid to satisfy the two original collateral mortgage notes and retroactive ranking as to additional funds loaned was denied because the court found that there was no evidence to prove an agreement at the time of the original pledge that the pledge would secure future advances. The court observed that the first note for $110,000 was pledged to SISB by Elam and Killian on September 28, 1981 and on that same date a hand note was executed and loan funds were distributed for $64,000. The second note for $50,000 was pledged to SISB by Elam and Killian on December 15, 1981 and on that same date a hand note was executed and loan funds were distributed for $25,000. WSB obtained posses *728 sion of the two notes on or about August 31, 1982 upon payment to SISB of $142,-128.26 for which WSB received the collateral loan packages. The court found these transactions constituted a payment with subrogation to SISB’s privileges and mortgages and WSB was subrogated to all of the rights, privileges and mortgages to which SISB was previously entitled. Therefore, the claim of WSB was retroactive for the purpose of ranking to the dates of recordation of the two collateral mortgages — September 28, 1981 and December 15, 1981. Any collateral mortgages filed subsequent to the recordation of the plaintiffs lien and loans made pursuant thereto would be primed by plaintiff's lien.
After examining the Private Works Act, the trial court concluded that plaintiffs architectural and engineering lien affected third persons only from the date of rec-ordation and not from the date that work had commenced. Thus, as plaintiffs lien was recorded subsequent to the dates of recordation of the two collateral mortgages, the lien would thereby be primed by those collateral mortgages.

Legal Principles

Unlike the other two forms of conventional mortgage, a collateral mortgage is not a pure mortgage but rather is the result of the judicial recognition that one can pledge a note secured by a mortgage and use this pledge to secure yet another debt. The collateral mortgage package consists of at least three documents and takes several steps to complete. First, there is a promissory note usually called a collateral mortgage note or a ne varietur note. The collateral mortgage note is secured by a mortgage and this mortgage provides the creditor with security in the enforcement of the collateral mortgage note. At this point, a collateral mortgage appears to be identical to both a mortgage to secure future advances and an ordinary or conventional mortgage. However, a distinction arises in the collateral mortgage because money is not directly advanced on the note that is paraphed for identification with the act of mortgage. Rather, the collateral mortgage note and the mortgage which secures it are pledged to secure a debt. A collateral mortgage note may be pledged to secure future obligations. In that event, full payment of a given obligation will not extinguish the collateral mortgage note and accompanying mortgage and the collateral mortgage will have ranking from the initial pledge. First Guaranty Bank v. Alford, 366 So.2d 1299 (La.1978); Pelican Homestead & Savings v. Security First National Bank, 532 So.2d 397 (La.App. 3rd Cir.1988), writ denied, 533 So.2d 381 (La.1988); People’s Bank & Trust Company v. Campbell, 374 So.2d 741 (La.App. 3rd Cir.1979), writ denied, 376 So.2d 1268 (La.1979); Cameron Brown South, Inc. v. East Glen Oaks, 341 So.2d 450 (La.App. 1st Cir.1976).
In addition to the mortgage and note, there must be a third element, a pledge of the mortgage note, to create a collateral mortgage which would rank-only from the date the mortgage note is pledged. Mingledorff v. American Bank and Trust Company, 420 So.2d 463 (La.App. 2d Cir.1982), writ denied, 423 So.2d 1161 (La.1982) and Wallace v. Fidelity National Bank, 219 So.2d 342 (La.App. 1st Cir.1969), writ refused, 253 La. 1083, 221 So.2d 517 (1969). When the collateral mortgage is pledged to a creditor and the note remains in the hands of the creditor to secure a particular loan or any other obligation existing or thereafter arising, the pledge continues against third persons and any new liabilities or loans are secured by the collateral to the same extent as if they came into existence when the instrument or item was originally pledged and the pledge was made to secure them. Acadiana Bank v. Foreman, 352 So.2d 674 (La.1977); and New Orleans Silversmiths, Inc. v. Toups, 261 So.2d 252 (La.App. 4th Cir.1972), writ refused, 262 La. 309, 263 So.2d 47 (1972).
In a similar case, the Supreme Court in Texas Bank of Beaumont v. Bozorg, 457 So.2d 667 (La.1984), examined the ranking of collateral mortgages executed by the defendant. On August 12, 1975 Bozorg executed a collateral mortgage note and mortgage in the amount of $200,000 and at the same time executed a $200,000 hand note. Bozorg pledged the collateral mort *729 gage note to First Metropolitan Bank (hereinafter referred to as FMB) to secure the indebtedness represented by the hand note and the mortgage was duly recorded. On September 11, 1978 Bozorg executed a collateral mortgage note and mortgage in the amount of $344,406.59. Bozorg pledged that note on the same day to Massey-Ferguson, Inc. (hereinafter referred to as MFI) to secure the payment of a hand note in the same amount. In this act of mortgage, Bozorg committed himself not to increase the indebtedness secured by the August 12, 1975 collateral mortgage and instructed FMB not to increase the indebtedness which had been reduced to $96,000. By notarial act and for the stated consideration of $88,025.34, on January 4, 1980 FMB transferred and assigned to Texas Bank of Beaumont (hereinafter referred to as TBB) all its rights, title, interest, priority and privilege in connection with the August 12, 1975 collateral mortgage and mortgage note in the sum of $200,000. Bozorg’s balance then due on the note was $88,-025.34, including the principal and interest. On February 4, 1980 Bozorg executed a hand note for $200,000 and pledged the August 12, 1975 collateral mortgage note to TBB to secure the hand note. On February 11, 1981, TBB instituted the action alleging that the $200,000 note of February 4, 1980 was in default and sought to enforce the August 12, 1975 mortgage by having the mortgaged property seized and sold. MFI intervened seeking to have its September 11, 1978 mortgage recognized and ranked as superior to TBB’s mortgage. The trial court rendered judgment in favor of FMB finding that TBB had paid off and extinguished the original debt and therefore was not entitled to retroactive ranking, which judgment was reversed by the Court of Appeal. The Supreme Court re-' versed in part, concluding that TBB had established by a preponderance of the evidence that the January, 1980 transaction was at least a payment with subrogation which reserved the 1975 collateral mortgage ranking as to Bozorg’s then existing principal obligation but failed to establish that the parties agreed in the 1975 contract of pledge that the pledge was intended to secure other of Bozorg’s obligations which arose after the date of the 1975 contracted pledge.
The Supreme Court noted that in a contest involving ranking of mortgages, each claimant has the burden of proving the effective date of his mortgage as to third persons. The court observed that the primary issues in the ranking of the mortgages were whether TBB had proved it succeeded to FMB’s rights in the pledge collateral by virtue of the 1980 transaction and whether TBB had proved that it was entitled to retroactive ranking with an effective date against third persons of August 12, 1975. Examining the evidence, the Supreme Court noted the FMB bank officer testified that the parties intended for TBB to buy FMB’s collateral position. The Court concluded the evidence, while insufficient to show that the principal obligation was assigned to TBB, did show that the debt was paid by TBB on the condition that FMB’s rights in the collateral mortgage were transferred to it. Accordingly, TBB had proven at least that it had paid the principal obligation with subrogation to FMB’s privileges and mortgages. The Court held that the $88,025.34 paid by TBB to FMB remained at all times secured by the pledge of Bozorg’s earlier collateral mortgage note effective as of August, 1975. Thus, TBB’s mortgage would prime the later mortgage of MFI as to that amount.
It has been held that the term “bona fide” mortgage, as used in the Private Works Act insofar as the ranking of collateral mortgages is concerned, has reference to the date that the collateral mortgage note was pledged to the lender. American Bank & Trust Company, Etc. v. F & W Construction, 357 So.2d 1226 (La.App. 2d Cir.1978), writ denied, 359 So.2d 1306 (La.1978).
The Private Works Act which gives laborers, materialmen, contractors and others designated therein liens on private works, is to be strictly construed against the parties in whose favor the liens are created. The rationale of the jurisprudence interpreting the Private Works Act is that *730 the liens granted by the pertinent statutes are to be rigidly interpreted against the lienors and liberally construed in favor of third parties whose common rights are thereby impinged upon. Courshon v. Mauroner-Craddock, Inc., 219 So.2d 258 (La.App. 1st Cir.1968).
With reference to an architectural and engineering lien contained in the Private Works Act, at the time of the commencement of this construction and the filing of the architectural lien by the plaintiff, the architectural lien was apparently governed by the provisions of La.R.S. 9:4813. That statute was subsequently re-enacted and is now contained in La.R.S. 9:4801 and La. R.S. 9:4822 D. The legislative comments indicate that the re-enactment was not intended to change the existing law. As the re-enactment did not change the substance of the law and the parties make no assertion thereto, for simplicity we shall refer to the statutes under their new designations.
La.R.S. 9:4801 provides in pertinent part that licensed architects have a privilege on an immovable for the price of professional services rendered in connection with the work that is undertaken by the owner. Further, La.R.S. 9:4822 D provides that the architect has to file a statement of his claim or privilege within sixty days of the filing of a notice of the termination of the work that the services giving rise to the privilege were rendered or substantial completion or abandonment of the work if a notice of termination is not filed. The privilege shall have no effect as to third persons acquiring rights in, to, or on the immovable before the statement of claim or privilege is filed.

Ranking of Liens and Mortgages

Plaintiff argues that its lien ranks from the date that construction commenced, September 10, 1981, and not the date that the lien was filed, December 23, 1981. Thus, its lien would prime the two original collateral mortgages now held by WSB, dated September 25,1981 and December 14,1981. Alternatively, plaintiff argues that WSB’s payment to SISB for the two collateral mortgages did not constitute a payment with subrogation thus entitling WSB to retroactive ranking. Therefore, WSB’s mortgages are effective only from the date of the pledge, August 18, 1982, and would be primed by plaintiff’s architectural lien.
As noted above, La.R.S. 9:4822 D, formerly La.R.S. 9:4813, specifically provides that the architect’s privilege has no effect as to third persons until the statement of claim or privilege is filed. Since the collateral mortgages were filed prior to the recordation of the statement of the architect’s lien, the statute clearly states that the mortgages would prime the architectural lien. The same issue was previously examined in National Bank of Commerce v. Southern Land Title Corporation, 244 So.2d 685 (La.App. 4th Cir.1971), writ refused, 258 La. 569, 247 So.2d 392 (1971), and Capital Bank & Trust Company v. Broussard Paint & Wallpaper Company, 198 So.2d 204 (La.App. 1st Cir.1967), where it was held that an architect’s lien was not entitled to priority over a mortgage even if the work was commenced prior to the recordation of the mortgage where the architectural lien was filed after the date of recordation of the mortgage.
Therefore, plaintiff’s claim that its lien ranks from the date that construction commenced and not from the date of rec-ordation is without merit.
Plaintiff contends that WSB’s payment of $142,128.26 for the two collateral mortgages held by SISB did not constitute payment with subrogation so as to entitle WSB to retroactive ranking. Based upon the evidence presented at trial, it appears that the funds used to purchase the two collateral mortgage notes held by SISB were never passed through the borrowers’ hands but instead went directly from the purchasing bank to the selling bank. The testimony of the bank officers of SISB and WSB, Hampton and Bordleon, established that the intent of the banks was that SISB would transfer its security interest and mortgage position to WSB in consideration of WSB purchasing the collateral mortgages packages. Considering the circumstances, it is clear that these parties intended WSB would be subrogated to the position *731 of SISB and thus entitled to retroactive ranking.
Further, considering the similarities in the facts and circumstances between this case and those in Texas Bank of Beaumont v. Bozorg, supra, where the testimony of a bank officer was admissible and sufficient evidence to establish the intent of the parties that subrogation would occur, we find that the Supreme Court’s ruling in that case is dispositive of the subro-gation issue presented herein.
For these reasons, the judgment of the trial court finding that the lien of the plaintiff, G.R.W. Engineers, Inc., was primed by the collateral mortgages held by Winns-boro State Bank and Trust Company is AFFIRMED. Costs of this appeal are assessed to plaintiff.
ON APPLICATION FOR REHEARING
Before FRED W. JONES, Jr., NORRIS, LINDSAY, MARVIN and HIGHTOWER, JJ.
Rehearing denied.